**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA** | : | |
| | : | |
| Plaintiff | : | |
| | : | Criminal Case No.: 21-CR-00127 |
| *v.* | : | |
| | : | |
| **JOSHUA MATTHEW BLACK** | : | |
| | : | |
| Defendant | : | |

..................................................................................................................................

### DEFENDANT'S MOTION TO RECONSIDER
### AND
### VACATE ORDER OF DETENTION

The Defendant, **JOSHUA MATTHEW BLACK,** by and through his attorney, Clark U. Fleckinger II, hereby moves this Honorable Court, pursuant to the provisions of 18 U.S.C. § 3145(b), to reconsider the Magistrate Judge's[1] grant of the Government's motion to detain Mr. Black pending trial pursuant to the provisions of 18 U.S.C. § 3142(f)(1)(E), (f)(2)(A), and (f)(2)(B).  Pursuant thereto, Mr. Black respectfully requests that the Court release Mr. Black on his personal recognizance with the least restrictive conditions designed to reasonably assure both the appearance of Mr. Black for future proceedings and the safety of the community.[2]  As grounds therefore, the Defendant represents as follows:

### Procedural Background

1.      That, on January 14, 2021, Mr. Black was arrested in Moody, AL and charged by Criminal Complaint with violations of 18 U.S.C. §1752(a) and (b) (Entering and

---

[1] The preliminary/detention hearing took place in the United States District Court for the Northern District of Alabama before the Honorable United States Magistrate Judge John H. England, III on January 20, 2021.

[2] Mr. Black would appear to be eligible for placement into a location monitoring program in the Northern District of Alabama pursuant to a courtesy supervision arrangement in that jurisdiction somewhat comparable to the HISP program operated by the DC Pretrial Services Agency in this jurisdiction although counsel for Mr. Black does not believe that that location monitoring program is necessary nor the least restrictive alternative to detention.  In any event, Mr. Black will abide by any and all conditions of release imposed by the Court, including the location monitoring program just referenced, should the Court believe the same to be necessary.

Remaining in a Restricted Building) and 40 U.S.C. § 5104(e)(2) (Entering and Remaining on the Floor of Congress) as a result of his presence at a political protest in Washington, DC which become destructive and caused injury to several persons at the United States Capitol on January 6, 2021.[3]

2.      That, on January 20, 2021, a preliminary/detention hearing was held before the Honorable United States Magistrate Judge John H. England, III, of the United States District Court for the Northern District of Alabama where the Government sought to detain Mr. Black pursuant to 18 U.S.C. § 3142(f)(1)(E), (f)(2)(A) and (f)(2)(B).   Magistrate Judge England found that Mr. Black did not pose a risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A).   The Government presented no evidence that Mr. Black posed a risk that he would obstruct justice or intimidate a witness pursuant to their request for detention pursuant to 18 U.S.C. § 3142(f)(2)(B) and that issue was not addressed by Magistrate Judge England. Nevertheless, Magistrate Judge England did find that Mr. Black posed a danger to the community and that there were no conditions, or combination of conditions, which would ensure the safety of the community.

3.      That, Mr. Black had his Initial Appearance in the District of Columbia before the Honorable Magistrate Judge Harvey on February 16, 2021.

4.      That, on February 17, 2021 Mr. Black was indicted in an 8 count indictment charging him with a violation of 18 U.S.C. § 1512(c)(2) (Aiding and Abetting the Obstruction of an Official Proceeding) as well violations of 3 subsections of 18 U.S.C. §1752 while armed with a dangerous weapon and 4 subsections of 40 U.S.C. § 5104.   Count 5

---

[3] Although Mr. Black recognizes that the political protest become violent and destructive as the result of the conduct of many in the group of protestors, Mr. Black neither intended to participate in any such activities nor did he commit any acts of violence or destruction.

charges him with Unlawful Possession of a Dangerous Weapon on Capitol Grounds in violation of 40 U.S.C. § 5104(e)(1)(A).

5.      That, Counsel for Mr. Black respectfully submits that Mr. Black does not pose a danger to the community.  However, in the event that the Court does not share that perspective, counsel respectfully submits that there are conditions of release which can be imposed by the Court which will provide reasonable assurance that any such risk can be minimized if not all together eliminated.

## Factual Background

6.      That, Mr. Black resides with his ex-wife, step-son, and brother at 252 Walnut St., Leeds, AL.  He owns that property and has resided at that address for the past 7 years. He has his own landscaping/lawn maintenance business which he has operated for the past 4 years.[4]  That information was verified according to the Pretrial Services Report from the Northern District of Alabama.  In addition, the FBI agents who arrested Mr. Black went to the above referenced home of Mr. Black with Mr. Black who consented to a search of his home.  Mr. Black will continue to reside there.

7.      That, Mr. Black has never been convicted of a criminal offense and there is no evidence of Mr. Black ever having failed to appear for a Court proceeding or violence in his past.

8.      That, Mr. Black has no alcohol or substance abuse issues.

9.      That, Mr. Black is a religious man who attends church regularly.

10.      That, Mr. Black does not have a passport.

---

[4] The business is a seasonal business and the opening of the business for the season typically begins in late March to early April and goes through mid to late fall.  Mr. Black is particularly concerned about losing clientele if he is not available for the commencement of the season.

11.     That, believing that there were election improprieties during the country's most recent Presidential election, Mr. Black traveled to Washington, DC, alone, in order to attend what he believed would be a show of support for President Trump.  It was the second time in his life that he had attended a political rally with the first having come days earlier during a similar rally for President Trump in Georgia – a rally which was not violent or destructive.  Mr. Black has no connection to any of the various groups such as The Proud Boys or The Oath Keepers that also attended President Trump's January 6, 2021 political rally in Washington, DC and, prior to arriving in the District of Columbia, he had no sense that the rally that he would be attending would devolve into the violence and property destruction that ensued and which was perpetrated by others.  Moreover, at the time that he entered the Capitol grounds, he had no intent to enter into the actual Capitol.  In fact, however, he did enter the actual Capitol with the rest of the crowd that made its way into the Capitol building.  Nevertheless, his intent upon entry was neither violent nor destructive.  Rather, it was symbolic and an act of civil disobedience which he believed was warranted as the result of President Trump's exhortations implicating the patriotic duty of his supporters.  It should also be noted that, upon information and belief, while on the grounds of, and in, the Capitol, Mr. Black encountered law enforcement on several occasions.  Each encounter was non-violent, respectful, and, in two (2) instances, intended to be protective of the officer(s).  During the course of one of the encounters when he tried to assist an officer who was the subject of violence at the hands of the crowd, Mr. Black was shot with a non-lethal projectile which went through his cheek.  When he later was on the Senate floor, he

admonished other protestors who were being disrespectful of, and desecrating, the Senate chamber and the institution.[5]

12.     That, while Mr. Black was in the District of Columbia to attend the rally as aforesaid, he was in possession of a small knife with a blade less than three (3) inches sheathed on his belt.  He typically carries that knife due to the nature of his work.  At the time of Mr. Black's attendance at the January 6 political rally, and later while he was present in the Capitol, the knife remained sheathed on his belt and under his coat.  It was never taken from its sheath.  It was never brandished.  It was not being carried as a weapon.  But for a YouTube video which Mr. Black created shortly after his participation in the protest,[6] and his admission to FBI agents on January 8, 2021, the Government would have been completely unaware of his possession of the knife while present on the Capitol grounds.

13.     That, on January 7, Mr. Black drove home to Leeds, AL aware that he may be the subject of law enforcement inquiry.  Accordingly, he contacted the FBI from his mobile phone and indicated to FBI personnel that he had been present at the Capitol the preceding day.[7]  On January 8, 2021 he, again, had telephone contact with FBI agents and,

---

[5] Undersigned counsel has received some discovery at the time of the filing of the instant motion.  Although video footage produced to date does not show Mr. Black's encounters with law enforcement at the time of his presence in the Capitol (although Mr. Black anticipates that further discovery will result in the production of *Brady* material related to his interaction with law enforcement on January 6 in additional footage), it does show his presence on the Senate floor.  There is nothing in the discovery provided to date which would suggest that Mr. Black ever engaged in violent or destructive behavior.  To the contrary, while on the Senate floor, Mr. Black admonished protest participants who were disrespectful to the institution of the Senate thereby dissuading them from further acts of disrespect.

[6] Mr. Black actually produced two (2) YouTube videos.  Although publicly available, those YouTube videos have been provided as part of the discovery provided to date.  Those videos can be found at the following link: https://www.youtube.com/channel/UCyemPV8BDYoDGgHNuxX0vTQ   In those videos, Mr. Black candidly tells the YouTube audience of what took place on January 6, his participation and his motivations.  Notwithstanding various admissions which implicate Mr. Black in conduct for which he may be criminally culpable, there is no indication that he participated in acts of violence or destruction.  To the contrary, he speaks of his peaceful and spiritual intent as well as his respect for law enforcement and the nation's seat of government.  The Government appears to credit that, and other, videos as credible accounts of Mr. Black's participation.  In any event, undersigned counsel provides the link noted above so that the Court is able to assess the overall credibility and tenor of Mr. Black's statement as to his involvement in the events of January 6.

[7] At the time of the call to the FBI on January 7, Mr. Black did not provide his name although he called from his cell phone which and the account is in his name and billed to his address.

at the agents' request, voluntarily met them in Moody, AL later that evening.[8]  At the time

that he met with those agents, Mr. Black believed that he would be arrested.  He was not

arrested on January 8 notwithstanding his admission during the interview that he was present

and a participant in the events of January 6 while possessing a knife, notwithstanding the

violence and destructive behavior of other participants in those events, and notwithstanding

the spiritual motivation[9] he told them was the basis for his presence at the rally called for by

President Trump which unexpectedly, at least to Mr. Black, resulted in the rally crowd

marching on, and entering, the Capitol.

14.     That, on January 14, agents from the FBI contacted Mr. Black again.  Despite

having a medical appointment which conflicted with their request to speak with him again,

Mr. Black canceled the appointment and drove to Moody, AL again and subjected himself

to further questioning without hesitation.  The stated purpose of the meeting was to have Mr.

Black assist them with the identification of others who participated in the events of January

6.  Again, he was candid with agents regarding his conduct on January 6 and, when the

agents asked Mr. Black for his consent to search his home specifically indicating that they

were interested in seeing the knife that he possessed on January 6, as well as the coat that he

wore and his phone, he consented to the search.  The agents drove Mr. Black to his home

and Mr. Black turned over the knife which was on the coffee table as well as his coat and

---

[8] Mr. Black's meeting with the FBI agents on January 8 in Moody, AL was also the subject of a video
recording which has been produced in discovery.  Mr. Black was not under arrest at the time of that interview
and he was not *Mirandized* prior to the commencement of the interview.  That meeting, which lasted for
about an hour, was a similarly candid account to the FBI of what he had done on January 6 and his
motivations.  Again, Mr. Black's account of what had taken place appears to have been substantially credited
by the Government
[9] Mr. Black advised the agents that his goal when entering the Capitol was to "plead the blood of Jesus"
while in the building and, in fact, was observed praying while on the Senate floor.  Some Christian
denominations use the term in the context of prayer and are referring to the practice of invoking the power of
Jesus Christ over any and every problem by using the phrase "I plead the blood of Jesus over _____."
Mr. Black's use of that term under the circumstances of January 6 was to invoke the spirituality of Jesus over
the Senate (and, possibly, the House) so that whatever transgressions the legislature was complicit in would
be resolved through the power of prayer.

his phone.  Thereafter, they drove back to the Moody police station together and Mr. Black was, at that time, arrested by the agents without incident.

15.    That, at the time of the detention hearing on January 20, the Government argued was that Mr. Black presented, not only a risk of flight for which they offered no evidence, but also, a danger to the community.  In support of that submission, they argued that some of Mr. Black's statements, either during the course of the YouTube videos or during the interviews of Mr. Black by the FBI agents on January 8 and 14, indicated a willingness to repeat his protest against the Government if God told him that he should as well as suggesting that he would be willing to become violent if the Government took peoples guns away or brought back slavery.  They also argued that Mr. Black's simple possession of a knife that he typically carries because of the kind of work that he does evidenced his danger to the community.  It is anticipated that the Government will rely on the same arguments in response to Mr. Black's current request to reconsider and vacate the Magistrate Judge's January 20 Order of Detention.

<u>**Argument**</u>

16.    That, as noted previously, Mr. Black poses neither a risk of flight nor a danger to the community.  While he was in the Capitol on January 6 he did not participate in any of the violent or destructive behavior exhibited others in the crowd.  He treated the law enforcement officers he encountered with respect and deference.  He admonished those in the crowd who were both violent and destructive as well as for their failure to respect the seat of government for which he was present in order to participate in what he anticipated, and considered to be, an act of civil disobedience in response to the political circumstance of his preferred Presidential candidate.  Although he possessed a knife with a blade of less than 3 inches which he typically carries for reasons related to his work, he never brandished

it or referred to it while present in the Capitol in contrast to those in the crowd who brought, and/or used, items such as bear spray, pepper spray, flag poles, lumber, and fists as weapons. The knife was never used, nor intended to be used, as a weapon.  There is no evidence of violence in his background.  There is no evidence that he was, or is, part of a group which promotes and/or plans violence in support of the group's political beliefs.  When he became aware that law enforcement wanted to speak with him in the immediate aftermath of the events of January 6, he contacted the FBI.  When the FBI asked him to meet with them a day later, he drove to the Moody, AL police station, believing that he was likely to be arrested, to meet with them and spoke candidly about his conduct.  Six (6) days later, on January 14, he did the same in response to the FBI's request to meet again – this time for the purpose of assisting the FBI in identifying other participants.  He consented to the search of his home and voluntarily provided the FBI with what they were most interested in – the knife, his overcoat and his phone.  Mr. Black has been nothing but cooperative with law enforcement authorities during, and in the aftermath, of January 6.  There is no reason to believe that Mr. Black presents the kind of danger to the community that the Government suggests and, even if the Court believes that some of the statements made by Mr. Black when addressing remote hypothetical situations evidence a current risk of danger to the community, there are conditions which the Court can impose which minimize that perceived risk.

17.    That, in addition, and to further address the concern of the Government that Mr. Black appears willing to act violently if God tells him to so act (an act which would be out of character for Mr. Black), Mr. Black advises that he will abide by whatever conditions of release the Court imposes and that, not only will he follow any Order of the Court, but that, God would never ask him to breach a promise that he made to someone including, most importantly in this context, the Court.

8

18.     That, it is a well-established principle that criminal defendants should not suffer imprisonment on a charge for which they have yet to be convicted.  *See Stack v. Boyle*, 342 U.S. 1 (1951).  In 1984, Congress enacted the Bail Reform Act to solidify this principle and to ensure that pretrial detention is utilized in only the rare cases in which community safety and flight are serious concerns.   In passing the Act, Congress did not intend to authorize the wholesale pretrial incarceration of all persons accused of criminal offenses.  Rather, Congress intended to reserve pretrial detention for only "a small but identifiable group of particularly dangerous [persons] as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons."  S. Rep. No. 225, 98th Cong., 1st Sess. 6-7, *reprinted in* U.S. Code Cong. & Ad. News 3189.   When implementing the provisions of the Bail Reform Act, courts have recognized that the Act clearly favors release over pretrial detention.  *See United States v. Orta*, 760 F.2d 887, 890-92 (8th Cir. 1985); *United States v. Miller*, 625 F. Supp. 513, 516-17 (D. Kan. 1985); *see also United States v. Salerno*, 481 U.S. 751, 755 (1987) ("In our society liberty is the norm and detention prior to trial or without trial is a carefully limited exception").

19.   That, the Bail Reform Act requires courts to release defendants who are pending trial on personal recognizance or on an unsecured appearance bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  Even if a court determines that personal recognizance or an unsecured appearance bond will not assure a defendant's appearance in court or protect the safety of the community, the court is not permitted to order the pretrial detention of a defendant without further inquiry.  When personal recognizance or an unsecured appearance bond are not

sufficient, the court must consider imposing an alternative condition, or combination of conditions, that will assure the defendant's appearance in court and the safety of the community.  *See* 18 U.S.C. § 3142(c).[10]  Examples of alternative conditions courts may consider imposing include employment or educational requirements, travel restrictions, stay away orders, a specified curfew, or a condition that the defendant refrain from the use of any controlled substance.  *See* 18 U.S.C. § 3142(c)(1)(B).

20.     That, Mr. Black submits that the Government has not sustained their burden that he poses an unreasonable risk of flight or danger to the community which has to be addressed by way of pretrial detention rather than conditional release which may include a restriction on political activity and/or travel during the pendency of the above captioned matter as well as regular monitoring – either by the DC Pretrial Services Agency or by the U.S. Probation Office in the Northern District of Alabama pursuant to a courtesy supervision arrangement for location monitoring.

**WHEREFORE**, for these and such other reasons as may appear to this Honorable Court, the Mr. Black requests that the Court release him on his personal recognizance with any conditions which the Court deems necessary in order to assure appearance in Court for further proceedings and the safety of the community.

Respectfully submitted,

_____/S/_____
Clark U. Fleckinger II
Attorney for Defendant
9805 Ashburton Lane
Bethesda, MD 20817
(301)294-7301
cufleckinger@aol.com
Bar No. 362393

_____

[10]When imposing an alternative condition, or combination of conditions, the court must select the "least restrictive" condition(s).  *See* 18 U.S.C. § 3142(c)(1)(B).

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true copy of the foregoing Defendant's Motion to Reconsider and Vacate Order of Detention has been served, by ECF, upon AUSA Seth Adam Meinero, at the United States Attorney's Office, located at 555 4th Street, NW, Washington, D.C. 20530, this 24th day of March, 2021.


_____/S/_____
Clark U. Fleckinger II