**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CASE NO. 21-CR-127 (ABJ)** |
| | : | |
| **JOSHUA BLACK,** | : | |
| | : | |
| *Defendant.* | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence defendant Joshua Black to 60 months of incarceration, three years of supervised release, $2,000 in restitution, a fine equivalent to the crowdfunding proceeds he received from his appearance on a podcast that sympathized with January 6 defendants, and the mandatory special assessment for his five counts of conviction totaling $320.

**I.      INTRODUCTION**

Black, who was found guilty of three felonies and two misdemeanors following a bench trial in January 2023, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $2.8 million in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the was $2,881,360.20.  That amount reflects, among other things, damage to the Capitol building and grounds and certain costs borne by the United States Capitol Police.

As established during the trial, Black—who was armed with a concealed knife—was the first rioter to breach the barricade at the Capitol's Lower West Terrace at approximately 12:57 p.m. on January 6.   He positioned himself at the front of the large, unruly crowd gathered at the West Plaza, and was shot in the face with a crowd-control munition at 1:07 p.m.   Despite suffering a gaping wound from the shot and witnessing numerous assaults on police officers, he remained on the Capitol grounds and made his way to the east side of the building.

Black also participated in the violent breach of the East Rotunda Doors, where he joined a heave-ho maneuver that pushed into a thin line of officers who desperately defended that entryway. Within two minutes of rioters prying the Rotunda Doors open, Black forced his way over the threshold at 2:40 p.m. and squeezed between two officers who could no longer prevent rioters from cascading inside.

Inside the Capitol, Black came upon two other officers who had just been attacked and defiantly shouted at them as they retreated, "We will not stand down."   Then he breached the hallowed Senate Chamber, where he remained for over 20 minutes.   There, he rifled through Senators' papers; took a photo of a document related to an objection to the certification of Arizona's Electoral College vote count; posed for photos on the Senate dais; sprawled himself on the floor talking on his cellphone; disregarded a police officer's requests for him and the other rioters to leave; and joined a disorderly spectacle styled as a prayer.   He did not leave the Chamber until police officers from the Metropolitan Police Department ("MPD") finally amassed the resources to drive him and others out and, ignoring many entreaties throughout the day to disburse, did not leave the Capitol grounds until nightfall.   During and after January 6, he made statements advocating for "independence" and abolishing the government.

As explained herein, a 60-month sentence, in the lower third of the applicable Sentencing

Guidelines range, would reflect the gravity of Black's conduct for which he has never accepted full responsibility.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

The government refers the Court to the Statement of Offense filed in this case (ECF 6 at 4-6) for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, Presidential election.

### B.   Black's Role in the January 6, 2021, Attack on the Capitol

As established at trial, Black traveled from Leeds, Alabama, to attend the "Stop the Steal" rally the former President held in Washington, D.C, on January 6, 2021.   He brought a knife with a blade over 3 inches long with him because, as he would later admit, he believed he could not carry a gun in Washington and he did not like being "defenseless."   While at the rally, he heard one individual say, "They're storming the Capitol after the speech."   After that and before Donald Trump's speech ended, he decided to walk to the Capitol.   (Trial Exs. 1.C.1, 101.II.)

> *1.   On the West Front, Black was the first to breach the Lower West Terrace barricade, and got shot with a crowd-control munition, which further roiled the violent mob.*

The first breach of the Capitol grounds occurred at 12:54 p.m., when rioters overran a police barricade at the Peace Circle, located at the northwest sector of the grounds.   Black proceeded beyond where the Peace Circle barricade was breached and approached the north side of another police barricade in front of the Capitol's Lower West Terrace.   Police officers attempted to keep rioters behind the barricade and prevent them from advancing farther toward the Capitol.   (Trial Exs. 400, 402.A.1, 601, 602.)

At 12:57 p.m., Black tugged on the barricade, stepped over it, and walked toward the building.   Of the thousands of people who would converge on the Capitol's West Plaza on January 6, Black (wearing a red ball cap, green hooded camouflage outfit, and yellow gloves) was the first to breach the Lower West Terrace barricade, as depicted in the following two photos (Black outlined and circled in yellow):





United States Capitol Police ("USCP") Officer Wayne Gibson and another USCP officer intercepted Black and forced him back toward the barricade. Within one minute of Black's breach, other rioters followed his lead and completely overran the Lower West Terrace. (Trial Exs. 401.A, 402.A.1, 602.A).

Black walked to the south end of the Lower West Terrace and positioned himself at the front of the large crowd on the West Plaza and face-to-face with police officers who had formed another defensive line. At one point, rioters pushed into the police line where Black stood. Despite the crowd's unruliness, Black did not leave that area, and he made physical contact with the officers as the rioters pushed him and themselves into the line, as depicted below (boxed in yellow wearing a green-camouflage hood and red hat):



(Trial Exs. 417, 417.B.)

Officers deployed less-than-lethal munitions to control the growing and increasingly violent mob on the West Plaza. Black was struck in the left cheek by a munition, causing a gaping wound and copious bleeding, depicted below (Black had removed his red hat and hood and donned a black knit cap and sunglasses at that point, but later put the red ball cap back on):



(Trial Ex. 605.)

Rioters near Black became enraged that he was shot, and they harassed and assaulted officers.   A melee ensued, and an officer fell to the ground.   Black knelt beside the officer and yelled, "Don't hurt him."   Another officer pushed Black away and rescued the officer on the ground.   Less than two minutes after this incident, Black proclaimed to an individual videorecording the events, "We the people of the United States of America declare our independence.   Blood, sweat, and tears.   Praise the name of Jesus.   This is the land of the Lord. God brought us here.   God gave us freedom."

Despite observing numerous other assaults on officers and verbal confrontations by the mob around him, Black remained on the grounds.   As Black later admitted, at one point, when officers offered him aid, Black refused their help because, "I'm with them [. . .] I'm a patriot," referring to the other rioters.   He later accepted the assistance of officers who took him behind their line to render aid for his wound.   At another point, Black saw a long wooden beam pushed into the police line.   During his time on the West Plaza, the mob loudly chanted numerous times

"Stop the Steal" in earshot of Black.   (Trial Exs. 1.BB, 607, 611.)

   2. *On the East Front, Black joined a heave-ho against officers and breached the*
      *Capitol building.*

Black later moved to the Capitol's East Front and participated in the violent breach of the

East Rotunda Doors.   For several minutes, Black was among a larger group of rioters that

screamed at, pushed, grabbed, threw objects at, sprayed chemical irritants at, and wrested a riot

shield from a thin line of just five or six remaining USCP officers defending that entryway.   USCP

Officer Marc Carrion testified that the scene was "very apocalyptic, [. . .] all five of our senses

were overwhelmed all at once."   At one point, Black joined several rioters in a heave-ho maneuver

designed to breach the Doors, as depicted below (Black outlined in yellow, officers in doorway

circled in blue):



(Trial Exs. 703.A, 707; 1/9/2023 Trial Tr. at 193-94.)

   Black advanced to the doorway, where he came face-to-face with Officer Carrion, who was

cornered.   Officer Carrion remembered Black was "basically moving forward" to the doors and

"trying to avoid eye contact."   He did not recall any verbal interaction with Black, but Black later

claimed he told Officer Carrion, "Hey, man, we don't want to hurt you. [. . .] I appreciate your service.   But [. . .] we've got to show these politicians that we mean business. [. . .] We're [. . .] tired of getting lied to.   We're tired of ya'll getting filthy rich off our backs, you know?" (1/9/2023 Trial Tr. at 192; Trial Ex. 1.E.1.)

  Rioters eventually breached the Rotunda Doors.   Black crossed the threshold of the Capitol at 2:40 p.m., forcing his way through and making physical contact with Officer Carrion and another USCP officer who could no longer prevent the rioters from flooding into that entryway, as depicted below:



(Trial Ex. 706.)

> *3. Once inside the Capitol, Black voiced his intentions—"We will not stand down"—and occupied the Senate Chamber, and he did not leave the Capitol grounds till nightfall.*

  Black roamed corridors in the Capitol's Senate Wing.   In the hallway outside the Senate Gallery, he encountered two plainclothes USCP officers who had just been assaulted by other rioters.   The officers retreated down the East Gallery Staircase.   Black followed the officers to

the top of the Staircase, and twice shouted down at them, "We will not stand down."   Soon after, he walked down the Staircase and appeared to look for the officers.   He eventually found a glass door leading to the Senate Chamber, beside another stairwell where a United States Senator had been evacuated by USCP officers less than three-and-a-half minutes before.   He tried to open the door, but it was locked.   He later recalled that he considered breaking the glass but decided not to because "this [is] our house.   [. . .]   [W]e don't act like that.   [. . .] I was tempted to, I ain't gonna lie.   [. . .] ['C]ause I'm, I'm pretty upset. [. . .]   They stole my country."   Eventually, other rioters found a way into the Chamber.   Black joined them, entered the Senate Floor at 2:48 p.m., and remained inside the Chamber for over 20 minutes.   (Trial Exs. 1.H.1, 410, 411, 508, 800, 801.)

When Black entered the Senate Chamber, personal effects, papers, water bottles, and open laptops remained on desks, evidence that the rioters had caused the Senators to abruptly abandon the certification proceeding and flee.   As depicted in the photo below, for an initial minute or so, he stood by an individual, Larry Brock (on the right), who was wearing military gear and carrying plastic flex-cuffs while also admonishing others not to engage in certain conduct because they were waging "an I.O. war" and an "information operation":



Black joined Brock's admonitions to other rioters.   (Trial Ex. 802.)

While on the Senate Floor, Black attempted to access a laptop that was abandoned on Senate staff's desk.     He (circled in yellow) and other rioters also rifled through papers in the desk assigned to Sen. Ted Cruz, as depicted below:



(Trial Ex. 508.)   Black seized one of the documents—Sen. Cruz and Rep. Paul Gosar's objection to the certification of the Electoral College count vote for the State of Arizona—and photographed it:



(Trial Ex. 300.)

Black also posed for photos on the Senate dais and splayed himself out on the floor of the Chamber, resting his back against the clerks' area of the dais and talking on his cellphone:

 

(Trial Exs. 301, 802.)   He later emotionally recounted that he called his father and told him, "I'm pleading the blood of Jesus on the Senate floor."   (Trial Ex. 2.AAA.)

A lone USCP officer, Keith Robishaw, entered the Senate Chamber at 3:00 p.m., after Black and the other rioters had occupied the space for over 11 minutes entirely on their own. Officer Robishaw found himself facing off against 20 or more rioters on the Senate Floor as he entered—with no way of knowing who was armed—and asked Black and other rioters to leave the Senate Chamber at least twice, pleading with them that the Senate dais where they were congregating was the "sacredest place."   This was the first time Officer Robishaw had ever been on the Senate Floor; not even he, a police officer assigned to the USCP's House Division, was allowed to enter the Senate Floor.   (1/10/2023 Trial Tr. at 373, 379-80; 1/13/2023 Verdict Tr. at 12.)   But Black did not get up from the floor.   (Trial Ex. 802.)   Eventually, Black (circled in

yellow) arose to participate in a raucous demonstration styled as a prayer at the Senate dais led by another rioter, Jacob Chansley (also known as the "QAnon Shaman"):



Immediately following this spectacle, Chansley—who had carried a makeshift spear into the Chamber and whom Black later characterized as a "psychopath"—encouraged others to give a "shout out" and a "Hoo-ah" for Black (circled in yellow), referring to him as "a fucking champ." (Trial Exs. 100.EE, 510.)   Black did not leave the Senate Chamber until a column of several MPD officers forced rioters out at 3:09 p.m.   He exited the Capitol at the Senate Carriage Door at 3:10 p.m.   (Trial Exs. 408, 415, 508.)

Sometime after exiting the building, and while still on the Capitol grounds, Black was interviewed by a videographer and stated:

> The heart of the king is in the hand of the Lord.   He turns it whithersoever He will. [. . .] Federal taxes?   Pay 'em if you want to.   But, you know what I'm saying? A well-regulated militia's a good idea right now.   I'm not a violent guy.   Like, I don't like violence at all.   But, I mean, we can't put up with this, man.   Like, this ain't – you know?   But if Biden becomes president – goodbye, America.

(Trial Ex. 614.)

Based on evidence not presented during the trial, the government learned that after Black exited the Capitol at 3:10 p.m., he did not leave the Capitol grounds until nightfall.  As USCP Officer "M.W." later reported to the FBI, he encountered Black earlier in the day on the West Plaza.[2]   Black told other rioters "to lay off the officers" and that the officers were "just doing their jobs."   This appeared to have a calming effect on some rioters in that area for a short time.   Officer M.W. allowed Black to go behind the police line to receive some medical aid.   Officer M.W. saw Black again when it "was dark out," after USCP officers had engaged in an hours-long, violent struggle at the West Terrace Door, also known as the "Tunnel."   After finally pushing all the rioters out of the Tunnel and clearing much of the Lower West Terrace, Officer M.W. and other officers were in the process of re-forming a police line when Black called out to him.   Black smiled and told Officer M.W. that he had made it inside the Capitol.

### C.    Black's Statements after January 6, 2021

Following January 6, Black admitted participating in the riot in a testimonial he posted to YouTube on January 8, 2021.   Among other statements about his conduct, he professed his belief that the 2020 Presidential election and his country had been "stolen"; claimed he wanted to get inside the Capitol to "plead the blood of Jesus over it"; and admitted he was carrying the knife when he entered the building.   He also described his intentions and motivations for entering the Capitol:

> Once we found out that Pence turned on us and that they had stolen the election, like officially, the [. . .] crowd went crazy.   I mean, [. . .] it became a mob.   We crossed the gate, we got up.[3]

---

[2]  The FBI Form FD-302 memorializing this interview was provided to the defense on November 28, 2022, and is attached to this memorandum as Attachment A (redacted).

[3]  Evidence at trial established that Vice President Pence issued a public statement at 1:02 p.m. on January 6, 2021, announcing that he was about to preside over a Joint Session of Congress to count the Electoral College votes and that he had concluded he did not have the authority to reject electoral votes.  (1/11/2023 Trial Tr. at 408-09.)   The notion that Vice President Pence would

\*   \*   \*

I make it around to the other side of the building. [. . .] [A]nd I was sitting there thinking, "Why is everybody just sitting on the steps?"  I thought that the goal was to show the politicians that [. . .] the people run this country.   That's the way it's supposed to be.

\*   \*   \*

So I walked up to the top and next thing I know I'm at the door. I don't know how I got there, but I was at the door.   And, uh, people were – people were just, it was – it, it, it became a – it was a mob-rule situation.   You know what I'm saying?   It was – the patriots were pissed.

\*   \*   \*

This was just the we the people standing up to obey the Constitution and abolish a [. . .] corrupt government. [. . .]   [I]t's a crooked Democrat House.   [. . .] Crooked Republicans too.     And a crooked Democrat Senate.     Crooked Republicans too.   And now there's a straight up crooked, lying, cheating [. . .] president.   And I ain't even gonna say[] nothing about Kamala Harris.

(Trial Exs. 1.A.1, 1.DD, 2.A.1.)

Besides posting his testimonial to YouTube on January 8, Black made his YouTube profile

photo this picture, which displayed his wound from January 6:



(Trial Ex. 5.)

Black's cellphone records, which were not presented at trial, reveal that on January 8, 2021,

---

betray Trump supporters by not resolving the counting of electoral votes in Trump's favor was established by Trump in multiple statements he made during a rally in Dalton, Georgia, two days before, which Black attended. The Dalton rally is discussed, *infra*.

after Black posted his video testimonial to YouTube, he sent links to the video to at least one friend, "D.C."   After D.C. received the links, he texted Black, "If you don't mind, don't mention me."   Black replied, "I referred to you as a fellow patriot."

Black also participated in two voluntary interviews with the Federal Bureau of Investigation ("FBI") on January 8 and 14, 2021.   During the interviews, Black admitted he was wearing a knife on his hip when he was inside the Senate Chamber.   (Trial Ex. 101.C.1.)   He also recounted his reaction to a police officer at the Rotunda Doors who said he was "just doing [his] job" and that he "swore an oath":

> And I was like, "Yeah, to defend the Constitution and that [. . .] ain't what you're doing right now.   You're defending a bunch of crooked politicians," you know? Which I'm glad they got them outta there, because if the mob had a got ahold of them, it would've been -- it would not have been good.   'Cause America is pissed off at our elected officials.   You can't trust them no more.   They're -- they're a bunch of dirt bags, you know?

(Trial Ex. 100.F.1.)   Black also voiced his and what he perceived to be others' anger at the election results:   "America is mad.   The ones that are paying attention. [. . .] It's gonna have to be the Lord.   'Cause the only thing that can happen now is a, an armed revolution. And I just don't wanna see that, you know?"   (Trial Ex. 100.G.1.)

During a voluntary search of his residence in Alabama on January 14, the FBI recovered the clothing and knife Black admitted he wore inside the Capitol.   The FBI arrested him later that day.   (1/9/2023 Trial Tr. at 121, 129.)

While the defense's opening statement characterized Black as possessing limited education and no sophisticated knowledge about the political system (1/9/2023 Trial Tr. at 14), the government is aware of additional evidence, not presented at trial, that Black was politically engaged and savvy.

In his two interviews with the FBI on January 8 and January 14, 2021, Black admitted that

before he traveled to Washington for the "Stop the Steal" rally, he attended a political rally in Dalton, Georgia, on January 4, 2021.   (ECF 68, Attach. C at 15, Attach. D at 15.)   During its opening statement at trial, the defense also acknowledged Black attended this rally.   (1/9/2023 Trial Tr. at 15-16.)   The rally was to support Georgia's two Republican candidates for the United States Senate, incumbent Senators David Perdue and Kelly Loeffler, who were contesting a run-off election on January 5.   The centerpiece of the rally was a speech by Trump, who claimed multiple times that Democrats had stolen the Presidential election and also said, "I hope Mike Pence comes through for us, I have to tell you."[4]

At approximately 36 minutes into Trump's speech, he invited Senator Loeffler to make remarks.   She announced that "[o]n January 6th, I will object to the Electoral College votes."   About three minutes after that, Representative Marjorie Taylor Greene addressed the crowd and praised Senator Loeffler's decision "to object on January 6th."

Senators Perdue and Loeffler lost their run-off races on January 5, which resulted in a 50-50 party balance in the Senate and would put the Democrats in the majority once Democratic Vice President Kamala Harris could cast a tie-breaking vote.   Reflecting on the rally during his January 14 interview, Black opined it was "very depressing."   (ECF 68, Attach. D at 15.)

Also during the January 14 interview, agents asked Black about the intentions of people entering the Senate Chamber.   Black used the phrases "Stop the Steal" and "do the right thing"[5]

---

[4]   A video of the Dalton rally is available at https://www.c-span.org/video/?507634-1/president-trump-campaigns-republican-senate-candidates-georgia.   A transcript of Trump's speech and other speakers' statements during the rally is available at https://www.rev.com/blog/transcripts/donald-trump-rally-speech-transcript-dalton-georgia-senate-runoff-election.

[5]   In arriving at its verdict of not guilty as to Count One, the Court noted that the evidence at trial did not include "one single text or Tweet or statement by [Black]—before, on, or after January 6—where he articulates his grievance in terms of anything that Congress was supposed to do in terms of any proceeding that was going on that day.   We don't even have one single statement where

to explain what he and other rioters could have exclaimed "outside the door" to show Senators "you're supposed to be working for us."   (ECF 68, Attach. D at 32.)        Besides "Stop the Steal," the phrase "do the right thing" was another frequently employed shibboleth for Trump and his supporters in the days leading up to January 6.   The phrase signified the idea that then-Vice President Pence and Congress might not certify the election on January 6, and instead could "do the right thing" by returning the votes to the states.   Trump repeatedly used the phrase, or variations of it, in his speech at the Ellipse on the morning of January 6.   *See* CNN.com, *Read: Former President Donald Trump's January 6 speech* (last visited on Apr. 8, 2023) (transcript of Trump's Ellipse speech) available at https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html ("I hope Mike is going to do the right thing"; "[I]f Mike Pence does the right thing, we win the election"; "We have to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.").   Black's use of both the "Stop the Steal" and "do the right thing" mantras signals the depth of his understanding about the certification proceedings on January 6, 2021.

### III.    THE CHARGES AND CONVICTIONS

On February 17, 2021, a federal grand jury returned an initial indictment charging Black with eight counts.   On December 7, 2022, the grand jury returned a superseding indictment charging six counts:

(1)    Count 1: Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. §§ 1512(c)(2), 2);

(2)    Count 2: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1), (b)(1)(A);

(3)    Count 3: Disorderly and Disruptive Conduct in a Restricted Building or

---

Mr. Black uses the phrase 'Stop the Steal.'"   (1/13/2023 Verdict Tr. at 30.)   This additional evidence, though not presented at trial, is relevant to sentencing.

Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2), (b)(1)(A);

(4)    Count 4: Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(1)(A);

(5)    Count 5: Entering and Remaining on the Floor of Congress, 40 U.S.C. § 5104(e)(2)(A); and

(6)    Count 6: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D).

Beginning on January 9, 2023, the Court held a bench trial.  On January 13, 2023, the Court convicted Black of Counts 2, 3, 4, 5, and 6, and acquitted him of Count 1.

## IV.    STATUTORY PENALTIES

Black now faces sentencing on Counts 2 through 6 and the following penalties:

| Count | Offense | Maximum Penalties |
|-------|---------|-------------------|
| 2 | Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1), (b)(1)(A) | 10 years in prison; $250,000 fine; or both; and mandatory $100 special assessment |
| 3 | Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2), (b)(1)(A) | 10 years in prison; $250,000 fine; or both; and mandatory $100 special assessment |
| 4 | Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(1)(A) | Five years in prison; $250,000 fine; or both; and mandatory $100 special assessment |
| 5 | Entering and Remaining on the Floor of Congress, 40 U.S.C. § 5104(e)(2)(A) | Six months in prison; $5,000 fine; or both; and mandatory $10 special assessment |
| 6 | Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D) | Six months in prison; $5,000 fine; or both; and mandatory $10 special assessment |

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

While the government notes one immaterial error in the United States Probation Office's ("USPO") grouping analysis of Black's counts of conviction, it agrees with its ultimate conclusion regarding Black's applicable Guidelines range.   The government's Guidelines analysis follows:

### A.   Analysis for Each Count

**Count 2:**   ***18 U.S.C. § 1752(a)(1), (b)(1)(A) – Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon***

| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) (Trespass) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): the trespass occurred while "a dangerous weapon [. . .] was possessed." <br><br> Black carried a knife, which the Court found to be a deadly or dangerous weapon, while he was on the restricted grounds of the Capitol and inside the building. |
| Cross-Reference | **\*See below** | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |

The cross-reference under U.S.S.G. § 2B2.3(c), which applies when the offense is committed with the intent to commit another felony, applies here.   Despite the Court acquitting

Black on Count 1 where proof beyond a reasonable doubt is required,[6] the evidence for sentencing purposes establishes by a preponderance of the evidence that Black unlawfully entered or remained in the Capitol building with a dangerous weapon—the crime of which he was convicted in Count 2, the violation of 18 U.S.C. § 1752(a)(1), (b)(1)(A)—with the intent to obstruct a congressional proceeding, in violation of 18 U.S.C. § 1512(c)(2) as charged in Count 1, which is a felony.   Even if Black did not commit the offense of obstructing a congressional proceeding, in his trespass, he acted *with the intent* to do so, as established by a preponderance of the evidence.   This conclusion is supported by the Court's detailed record of findings when it issued its verdict on January 13, 2023.

Specifically, the Court found that the government proved the first element of § 1512(c)(2), that Black "attempted to or did obstruct" the official proceeding.   (1/13/2023 Verdict Tr. at 17.) The Court found that the government did not prove the second and third elements that "the defendant intended to obstruct or impede the official proceeding," as alleged in the indictment, and did so knowingly.   (*Id.* at 29, 32-33.)   In reaching this conclusion, the Court noted that the government was required to prove that "the defendant has to have a particular official proceeding in mind," and "that appears to be absent from the government's proof in this case."   But the Court

---

[6] Earlier this year, the United States Sentencing Commission published proposed amendments to the Sentencing Guidelines for public comment including one proposed amendment that would have prohibited the use of acquitted conduct in applying the Guidelines.   U.S. Sentencing Comm'n, *Proposed Amendments to the Sentencing Guidelines* 211 (Feb. 2, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230201_RF-proposed.pdf.   However, the Sentencing Commission has decided not to adopt that amendment, and acquitted conduct will remain an appropriate consideration in applying the Guidelines.   *See generally* U.S. Sentencing Comm'n, *Amendments to Sentencing Guidelines (Preliminary)* (Apr. 5, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf. Nor is there any constitutional prohibition against using acquitted conduct, if proved by a preponderance of evidence, to increase the sentence up to the statutory maximum. *United States v. Watts*, 519 U.S. 148, 156 (1997).

also acknowledged that, based on the government's proof for these elements,

> [o]ne could, in good faith, [. . .] urge that one could draw the inferences, make the assumptions and connections it asks me to make.   And that could possibly be sufficient for Rule 29 purposes, where the Court is required to resolve all the inferences in favor of the government.   But as a factfinder, I cannot say in good conscience, that the government has proved this element beyond a reasonable doubt.   *I'm on the fence* and I am troubled by it and that's not good enough.

(*Id.* at 32-33 (emphasis added).)   The knowing element also "falls with the previous element, given the absence of specificity."   (*Id.* at 33.)

Because the Court acknowledged that it was "on the fence" whether the government proved the second and third elements based on a reasonable-doubt standard, noting the absence of direct evidence but the ability to draw that conclusion based on circumstantial evidence, the government submits that it proved these elements on the lesser preponderance standard, which applies when determining the applicable sentencing range.   *See* U.S.S.G. § 6A1.3 cmt. 1 ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").   And at the very least, the government has established by this lesser standard that Black entered and remained in the restricted area of the Capitol *with the intent* to obstruct the specific certification proceeding happening on the Senate floor that day.   The government will ask the Court at sentencing to expressly find these facts by a preponderance of the evidence.

In addition to the evidence the government presented at trial—including Black's remark that "Pence turned on us and that they had stolen the election, like officially"; the ample indications of an abruptly halted proceeding when he entered the Senate Chamber; and his photographing of the certification document from a Senator's desk—further evidence supports the conclusion that Black knowingly intended to obstruct the certification proceeding.   He remained on the West Capitol grounds until nightfall—after USCP officers had finally fended off the violent mob and

ended an hours-long struggle at the Lower West Terrace Tunnel—and proudly admitted to an officer that he had entered the Capitol earlier that day.   He invoked the present-tense phrases "Stop the Steal"—the slogan many Capitol rioters shouted, in earshot of Black, as they sought to obstruct the certification proceeding—and "do the right thing" during one of his FBI interviews as he described what rioters could have done when they were at the Senate Chamber door.   And he attended the Dalton rally on January 4, just two days earlier, during which speakers promoted the Senate run-off races of the two Georgia incumbents and made explicit statements about the January 6 certification proceeding.   Black's disappointment about the results of the run-off elections and knowledge that the result would be a Congress with a "crooked Democrat House" and a "crooked Democrat Senate" further demonstrate his savvy about recent political developments and the import of Vice President Pence and Congress's business at the Capitol on January 6.   In short, the speakers at the Dalton rally on January 4, and at the "Stop the Steal" rally on January 6, made it clear to Black and the rest of the audience that the path to stop Joe Biden from taking power and "stealing our country" was to interfere with Congress's certification of the vote count on the afternoon of January 6.

Finally, as to the fourth element requiring proof that "the defendant acted corruptly," the Court found it "need not decide this very close issue" due to its determination on the prior elements. But it also recognized that

> [g]iven the number of times [Black] repeatedly passed through or over obvious barricades, he repeatedly pushed his way past uniformed officers, he repeatedly ignored their official entreaties to desist or depart, all notwithstanding the very obviously illegal mayhem around him and the very obvious way the U.S. Capitol Police had tried to stop him in particular, a reasonable juror could conclude that this element was established.

(1/13/2023 Verdict Tr. at 35.)[7]

---

[7] The government also charged Count 1 on an aiding-and-abetting theory.   The Court also

All this shows, by at least a preponderance of the evidence, that Black knowingly committed the offense charged in Count 2 with intent to obstruct the certification proceeding on January 6, 2021, and did so corruptly.

Other judges in this district have applied the U.S.S.G. § 2B2.3(c) cross-reference based on similar conduct, even when the underlying 18 U.S.C. § 1752(a)(1) offense was a misdemeanor, unlike this case, where it is a felony because of Black's possession of a deadly weapon. Admittedly, these were not cases in which a defendant was acquitted of a § 1512(c)(2) count.  *See, e.g., United States v. Anthony Williams*, 21-cr-00377 (BAH), 9/16/2022 Sentencing Tr. at 49-51 (defendant also found guilty of § 1512(c)(2)); *United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-78 (defendant also found guilty of § 1512(c)(2)); *compare with United States v. Nicholas Rodean*, 21-cr-00057 (TNM), 10/26/2022 Sentencing Tr. at 5-11 (defendant not charged with § 1512(c)(2); court declined to apply the § 2B2.3(c) cross-reference to the § 1752(a)(1) misdemeanor conviction based on the case-specific facts—where in the court's assessment, the defendant did not intend to obstruct—but noted, "I think in many situations with many individuals the sum of the various pieces of evidence that the Government put forth at trial would certainly make out the guideline for obstruction of administration of justice [under the cross-reference]").  As succinctly explained by Chief Judge Howell in *Bledsoe*:

> The guideline at 2B2.3 applies to Count 2, charging: Entering and remaining in a restricted building or grounds, under 18 U.S.C. Section 1752(a)(1).  This guideline provides a base offense level of 4 under the Guideline at Section 2B2.3(a). Two offense levels are added because the trespass occurred at a restricted building or grounds, under the Guideline at 2B2.3(b)(1)(A)(vii).  It is then adjusted up to 25 offense levels pursuant to the guideline at 2B2.3(c)(1) and 2X1.1(a) because the offense was committed with the intent to commit the felony obstruction offense which adds up to 25 offense levels [pursuant to U.S.S.G. §2J1.2(a)] [. . .].

_____

concluded that the government failed to prove Count 1 beyond a reasonable doubt on this theory. (1/13/2023 Verdict Tr. at 35-36.)

As in these other cases, § 2X1.1(a) applies, and so the base offense level is determined by application of § 2J1.2:

| Base Offense Level (adjusted) | 14 | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Black entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work and to "show the politicians that [. . .] the people run this country."  He was the first individual to breach the Lower West Terrace barricade and positioned himself at the front of the mob that gathered on the West and East Fronts of the Capitol at various points during the early afternoon of January 6.  He entered and occupied the Senate Chamber for over 20 minutes and did not leave until police officers forced him and other rioters out.  He was aware of the certification proceeding based on the certification document he seized and photographed, the condition of the Chamber when he entered, and other surrounding circumstances, including his attendance at the Dalton rally.  His statements about his participation in the breach demonstrated his pride in and political motivations for entering the Capitol and Senate Chamber and his savvy about the political system and the circumstances of the 2020 Congressional elections.  He engaged in his conduct at the Capitol amid myriad surrounding examples of criminal conduct designed to obstruct the proceeding throughout January 6.<br><br>The substantive offense is thus Count 1, and the base offense level for that offense should be applied: U.S.S.G.   § 2J1.2(a) – Obstruction of Justice. |
| Specific Offense Characteristic | +8 | U.S.S.G.  §  2J1.2(b)(1)(B):  "the  offense  involved  causing  or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol Riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B).<br><br>There are multiple bases for application of this offense characteristic, in  light  of  U.S.S.G.  §  1B1.3,  which  encompasses  both  the defendant's own acts or omissions and those whom the defendant aided,  abetted,  counseled,  commanded,  induced,  procured,  or |

willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant, *see* § 1B1.3(a)(3). Black's conduct threatened to cause physical injury to police officers in order to obstruct the administration of justice.

First, as described above, Black was the first rioter to breach the Lower West Terrace barricade and he positioned himself multiple times at the very front of angry mobs on the West and East Fronts of the Capitol. That conduct helped open the floodgates to the mob of hundreds of rioters who quickly breached the police-guarded perimeters outside the Capitol and then the exterior doors of the Capitol building itself, with its ensuing violent attacks on hundreds of police officers. And as a result of Black's wound from the USCP's less-than-lethal efforts to remove the violent crowd, rioters grew enraged and began attacking the police with even more force and violence. The attacks on the police were spurred on by Black's presence in the area.

Second, he participated in the violent breach of the East Rotunda Doors, where he joined in a heave-ho maneuver thrusting into a thin police line defending the doorway. He remained at the front of the mob while other rioters pushed, pulled, screamed at, threw objects at, and sprayed chemical irritants on USCP officers. After rioters breached the doors, he forced his way over the threshold and in between two police officers, making physical contact with them.

Third, while roaming the Senate Wing corridors, he encountered two plainclothes USCP officers who had just been attacked by other rioters. As they retreated down the East Gallery Stairs, Black twice menacingly shouted at them, "We will not stand down." He followed after them and appeared to look for where they fled.

Fourth, he occupied the Senate Chamber for over 20 minutes. While there, Black associated with Larry Brock, who was dressed in military gear and carrying flex-cuffs, and Jacob Chansley, who carried a makeshift spear into the Chamber. Black disregarded the orders of a USCP officer to leave the Chamber, and he did not vacate until a column of police officers entered the Chamber to force him and other rioters out.

Fifth, he used belligerent rhetoric during a street interview after he exited the Capitol and while still on the grounds: "A well-regulated militia's a good idea right now. I'm not a violent guy. Like, I don't like violence at all. But, I mean, we can't put up with this, man.

| | | |
|---|---|---|
| | | Like, this ain't – you know?  But if Biden becomes president – goodbye, America."<br><br>Sixth, Black remained on the Capitol grounds until nightfall, after beleaguered police officers had engaged in a prolonged struggle and finally amassed the force to drive rioters out of the Tunnel and the Lower West Terrace. |
| Specific Offense Characteristic | +3 | U.S.S.G.  §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol Riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for almost six hours while legislators were physically evacuated for their own safety.  Black, by remaining on the Senate floor for over 20 minutes, obstructed and impeded this proceeding.   The riot he was part of resulted in evacuations, vote-count delays, officer injuries, and over $2.8 million in losses.   Law-enforcement officials from all over the D.C. metropolitan area were called in to assist in protecting the Capitol from the rioters.   Black's offense resulted in substantial interference with the proceedings in Congress. |
| **Total** | **25** | |

Count 3:       *18 U.S.C. § 1752(a)(2), (b)(1)(A) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon*

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) (Obstructing or Impeding Officers) |
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact."<br><br>Black made physical contact with the officers in front of the Lower West Terrace when rioters pushed him and themselves into the police line and he did not remove himself from that area.   Black also forced his way through and came into physical contact with two USCP officers after he entered the Capitol at the East Rotunda Doors. |
| **Total** | **13** | |

Count 4:       *40 U.S.C. § 5104(e)(1)(A) - Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings*

| Base Offense Level (adjusted) | 6 | U.S.S.G. § 2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility) |
|---|---|---|
| Cross-Reference | *See analysis for Count 2. | U.S.S.G. § 2K2.5(c)(1)(A): "If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or dangerous weapon with knowledge or intent that it would be used or possessed in connection with another offense, apply . . . § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above." |
| | | Black possessed a dangerous weapon—a knife—in connection with the commission or attempted commission of other offenses of conviction, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Count 2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Count 3), Entering and Remaining on the Floor of Congress (Count 5), and Disorderly Conduct in a Capitol Building (Count 6).  As shown by the analysis, above, Count 2 yields the highest offense level. |
| | | As with the cross-reference to § 2X1.1(a) under the § 2B2.3(c)(1) guideline for Count 2, the base offense level is determined by application of § 2J1.2.   After applying the pertinent specific offense characteristics to the adjusted base offense level, the total offense level is 25. |
| **Total** | **25** | |

**Counts 5 and 6:**        *40 U.S.C. §§ 5104(e)(2)(A) and (D) - Entering and Remaining on the Floor of Congress and Disorderly Conduct in a Capitol Building*

Counts 5 and 6 are Class B misdemeanors to which the Sentencing Guidelines do not apply.

*See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**B.    Grouping Analysis**

Under U.S.S.G. § 3D1.2, "closely related counts" group.

Counts 2 (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), 3 (Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and 4 (Unlawful Possession of a Dangerous Weapon on

27

Capitol Grounds or Buildings) all group because each involves the same victim, Congress. Because Counts 2 and 4 have a higher offense level, the offense level for the group is the offense level for Counts 2 and 4, which is 25.   *See* U.S.S.G. § 3D1.3(a) ("the offense level applicable to a Group is the offense level . . . for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.").

The USPO maintains that while Counts 2 and 4 group, Count 3 does not group with the other counts because there are different victims that are the subject of these counts.   (PSR at ¶¶ 41-42.)   The government disagrees and believes that Counts 2 through 4 all involve the same victim, Congress.   In any event, the government agrees with the USPO's conclusion that Black's total offense level is 25.   (PSR at ¶ 63.)   The USPO calculated Black's criminal history as category I, which the government also does not dispute.   (PSR at ¶ 66.)   Accordingly, based on the government's and the USPO's calculation of his total offense level, Black's Guidelines imprisonment range is 57-71 months.   (PSR at ¶ 104.)

Should the Court decline to apply the cross-reference to the guideline for Count 1 pursuant to U.S.S.G. § 2B2.3(c)(1) or otherwise not apply the enhancements the government and the USPO have found applicable to Black's conduct, the government will seek a variance to offense level 25 and ask the Court to impose a sentence of 60 months. The very conduct that supports the application of the cross-reference and these enhancements, detailed in the analysis above, warrants such a variance, and, as discussed further below, is consistent with the sentences imposed in similar cases arising out of the Capitol Siege where defendants with similar histories and characteristics engaged in similar conduct.

### C.    Black is Not Entitled to Acceptance-of-Responsibility Credit

Black is not entitled to a two-level offense level reduction under U.S.S.G. § 3E1.1 for

acceptance of responsibility.   Such an adjustment, the guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1, application n.2.

Although he does not dispute that legal principle, Black objects to the PSR on the ground that he is entitled to the reduction.   He claims that: he voluntarily turned himself in to the FBI shortly after his offense conduct; he consented to two voluntarily interviews with the FBI and to a search of his home for evidence related to his conduct; the parties had engaged in plea negotiations dating back to May 2021, and his counsel represented that Black would have entertained pleading guilty to one or more misdemeanors; following the December 20, 2021, pretrial conference, his counsel represented that he entertained pleading guilty to an unspecified felony; he entered into several evidentiary stipulations that resulted in streamlining the trial; and during trial, he conceded guilt as to Count 5 and "conceded as to several of the elements of the other offenses in the various other counts of the indictment."   All that is true, but none of it warrants a reduction for acceptance of responsibility.

Black did voluntarily surrender to the FBI and cooperate with the FBI's investigation leading up to his arrest, which can be considered in applying the two-level reduction under U.S.S.G. § 3E1.1, application ns.1(D), 1(E).   However, his cooperation occurred after he knew images of his criminal conduct were widely disseminated in news and social media and it was only a matter of time before the FBI would have identified and arrested him.   Black's counsel voiced interest in entertaining a misdemeanor plea at multiple times during the case's pendency.   But as the trial evidence established, Black's willingness to plead to misdemeanors in no way reflected his acceptance of responsibility for the seriousness of his actual conduct, and instead indicates his

eagerness to avoid responsibility for his felonious conduct.

Black's counsel also expressed—for the first time since Black's arrest over 18 months before—a nebulous interest in entertaining a felony plea shortly after the pretrial conference. Even if Black were interested in pleading to an unspecified felony offense as part of a favorable negotiated settlement—and it is far from certain that he would have actually entered a guilty plea— the untimeliness of that belated interest still belies any clear demonstration by Black that he had accepted responsibility.   *See* U.S.S.G. § 3E1.1, application n. 6 (timeliness of defendant's acceptance of responsibility is "a consideration" and "context specific").

Black also stipulated to many of the relevant facts and conceded guilt to two misdemeanor offenses—a lesser included offense of Count 2 (Entering and Remaining in a Restricted Building or Grounds) and Count 5 (Entering and Remaining on the Floor of Congress)—and elements of other counts during the trial.   (ECF 61, Attach. D; 1/11/2023 Trial Tr. at 566-570.)   All these factors can be considered in his favor under 18 U.S.C. § 3553.

But Black did *not* stipulate to the disputed, key fact at trial: his criminal intent.

As this Court will recall, Black's defense at trial was that he lacked the criminal *mens rea* to have committed certain offenses, most importantly, the felony Obstruction offense in Count 1, for which he was acquitted, and the felony offense of Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in Count 3, for which he was convicted.   (1/12/2023 Trial Tr. at 612 (defense counsel argued that Black "did not have the specific intent to commit all of the crimes [. . .] with which he has been charged").)    As set forth in the Court's instructions, Count 3 required proof beyond a reasonable doubt that Black knowingly engaged in disorderly or disruptive conduct in any restricted building or grounds "and with the intent to impede or disrupt the orderly conduct of Government business or official

functions."   (ECF 70 at 9.)

Black also contended he lacked the intent to "impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress" in Count 6 (*id.* at 14), a misdemeanor offense to which the Guidelines do not apply.   At trial, the defense claimed Black's sole purpose for entering the Capitol on January 6 was to "plead the blood of Jesus on one of the Houses of Congress,"   (1/9/2023 Trial Tr. at 22), a claim belied by the evidence.   That is a denial of the *fact* of his *mens rea*, not a legal argument divorced from the factual elements (such as a claim that a statute does not cover the admitted factual conduct, or that the admitted conduct is constitutionally protected).   U.S.S.G. § 3E1.1, application n.2.

In addition, while Black conceded that he carried a knife into the Capitol, he did not concede that the knife was a "deadly or dangerous weapon" in relation to Counts 2 and 3, or a "dangerous weapon" as to Count 4.   Litigation regarding the knife required extensive testimony, argument, and briefing by the government concerning a mix of factual and legal issues related to the nature of the knife and the measurement of its blade.

In short, Black "put[] the government to its burden of proof at trial by denying essential elements of guilt"—not only as to Count 1, but to the majority of the counts of conviction too— and was "convicted."   U.S.S.G. § 3E1.1, application n.2.   The Guidelines' commentary establishes that he is not entitled to acceptance credit.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the Capitol building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, all individuals who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's

statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place individual defendants on a spectrum as to their fair and just punishment.

The nature and circumstances of Black's crimes weigh heavily towards a significant term of incarceration.

Black was a notorious offender during the attack on the Capitol.   The nation was shocked and appalled at the events of January 6, and perhaps no other incident sparked as much as outrage and distress as Black and other rioters' occupation of the Senate Chamber.   Consequently, images of Black usurping the Senate Floor with other rioters featured prominently in national media.

In Black's own words, he believed the election—and his country—had been "stolen."   He and other rioters felt Vice President Pence had "turned on" them when Pence announced he did not have the authority to unilaterally resolve the electoral-vote certification in Trump's favor. Black's disdain for the nation's elected leaders assembled at the Capitol was plain: he wanted to show the "crooked," "dirt bag[]" politicians that "the people run this country" and can "abolish" the government.   As events unfolded on January 6 beginning with Trump's speech at the Ellipse, Black decided to leave the Ellipse and take his outrage to the seat of government.

Of the thousands of individuals who converged on the building on January 6, Black bears the distinction of being the first rioter to breach the barricade at the Lower West Terrace.   This brazen act no doubt encouraged other rioters, who soon after overran the entire Lower West Terrace.   Black then positioned himself at the front of the large, unruly mob on the West Plaza, face-to-face with police officers.   He remained at the front of the West Plaza crowd even after being struck with a less-than-lethal munition.   Despite incurring a grotesque injury, he did not

stand down.

Of the thousands of people who descended upon the Capitol's East Front, Black again muscled his way to the very front, directly in front of the besieged officers cornered at the Rotunda Doors, and entered the building within two minutes of the breach of that entryway.

And of the droves of rioters outside and inside the building, Black was one of the very few—20 or so individuals—who breached the Senate Chamber and the space that Officer Robishaw reverently called the "sacredest place."   All the while—beginning with his unlawful entry on the Capitol grounds through his approximately 30-minute incursion inside the Capitol— Black was armed with a knife and defied the unambiguous commands of police officers to leave the Capitol building and grounds.

Even worse, Black committed his offense while willfully disregarding the violence and mayhem all around him – even while knowing he was the direct cause of some of that chaos. Moreover, by spending over 20 minutes inside the Senate Chamber and approximately 30 total minutes inside the Capitol, Black played a direct hand in obstructing and delaying the certification proceeding – a delay that caused dismay to millions of Americans and people around the world who view the United States as a beacon of democracy and a model for the rule of law.

The government is unaware whether Black has yet expressed contrition for his conduct.[8] Far from being remorseful, he has been proud of what he did.   In addition, he has profited from his offenses.   On December 23, 2021, Black appeared on an episode of *Lumberjack Logic*, a self-described "political podcast" and blog geared to "talk about conservatism, freedom, and connect

---

[8] In correspondence from defense counsel dated April 20, 2023, counsel indicated that Black wanted to apologize to Officer Marc Carrion after his testimony and later in the trial, and counsel expects to address that issue at the sentencing.   This was the first instance in which the government learned that Black might express any form of contrition for his conduct.

patriots around the globe."   The platform views January 6 defendants as "political prisoners."

*Lumberjack Logic,* https://t.me/s/lumberjacklogicshow?before=1540 (last visited on Apr. 4, 2023).

Midway through the podcast, the host announced he would donate all the monetary contributions

raised during the episode "as a love offering" to Black and his family.   Black did not appear to

know that the host would donate money to him, and at one point, stated he would prefer that

followers not direct their donations to him.   Still, he expressed gratitude for the donations and

suggested he would use the money to re-shingle the roof to his house.   Based on the comments of

individuals who pledged contributions during the podcast and Black's acknowledgment that he

received donations, Black appeared to receive at least $807 in contributions resulting from his

podcast appearance.[9]

### B.      Black's History and Characteristics

Black has no prior criminal convictions, (PSR at ¶ 65), a factor that would normally

counsel in favor of a more lenient sentence.   But other characteristics are troubling.

On numerous occasions, Black invoked extremist and belligerent rhetoric.   Trial

evidence demonstrated that he envisioned an "armed revolution" due to anger over the election,

though he did not want to see that.   He also mused, while he was on the Capitol grounds and

police officers were still under attack, "A well-regulated militia's a good idea right now."   In

addition, during his January 8, 2021, interview with the FBI, an agent asked Black if he believed,

---

[9] A second guest on the podcast pledged to double any $100 contribution any viewer made during
the podcast.   Based on the podcast comments, there were at least four $100 contributions from
other viewers.   If the other guest followed through on his commitment, that would have resulted
in $400 in additional proceeds to Black, and Black would have realized at least $1,207 in total
contributions from his podcast appearance.   The amount Black received may have exceeded that
total; the podcast host asked viewers to donate to a PayPal account, and, presumably, individuals
could have made donations without commenting on them, and others may have donated after
viewing the webcast recording.

in general terms, that his freedom is being taken away.   Black replied:

> It hasn't yet, but I don't see it lasting very long.   Because if they ever take the guns, that's it.   'Cause then they can bring in the, the, the red shirts or the brown shirts or the, whatever. [. . .]   The same [. . .] thing the Nazis did.

When the agent asked why Black believed his guns would be taken away, Black replied in bleak

terms:

> 'Cause that's all they ever talk about.   [. . .] [Being able to possess a gun] guarantees safety and it guarantees freedom.   'Cause if they come in here trying to take something, you stop 'em.   [. . .]   But if they [. . .] ever get our guns, that's it. You know, if they ever talk about taking it, I mean -- all my guns are legal, but if I -- I don't know.   I just don't wanna kill anybody, you know?   But I don't know what's gonna happen next. [. . .]   I mean if they come in here trying to take our guns or try to turn America into slavery again, I don't want to see that, you know?

(ECF 68, Attach. C at 22-23.)

Black's doomsday assertions were not idle chatter by an armchair insurrectionist – he

participated enthusiastically and unapologetically in a violent riot that threatened the constitutional

transfer of power.   While somewhat mitigated by his lack of a prior criminal conviction, this factor

also counsels in favor of incarceration.

Black was cooperative leading up to his arrest.   He voluntarily turned himself in to the

FBI before they had ever contacted him, submitted to searches of his cellphone and residence, and

gave two lengthy, voluntary interviews.   He also appears to have complied with the conditions of

his pretrial release since April 2021, when he was ordered released following a detention hearing

before this Court.   (PSR at ¶ 9.)

In addition, Black demonstrated some humanity during the chaos on January 6.   At the

Lower West Terrace, he knelt beside an assaulted officer on the ground for a few seconds and

yelled to others, "Don't hurt him."   According to Officer M.W., Black also appeared to have a

calming effect on rioters acting hostile to police officers on the West Plaza.   But his subsequent

36

conduct—not turning back when he saw officers being viciously assaulted, participating in the brutal breach of the Rotunda Doors, occupying the Senate Chamber, defying police officers' commands to leave, remaining on the Capitol grounds till nightfall, and being proud of what he did—far overshadows these isolated acts of decency.

Despite his cooperation, compliance with pretrial release, and some mitigating behavior, the seriousness of Black's offenses demands a lengthy sentence of imprisonment.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10]   As with the nature and circumstances of the offense, this factor strongly supports a sentence of significant incarceration.

Black and his fellow rioters not only flouted the rule of law that day; they eviscerated it. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

---

[10] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at:

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Black has never admitted his conduct was wrong; indeed, he was proud that he breached the Capitol and relished the attention he received during and after the riot.   While he turned himself in to the FBI after he posted his YouTube testimonial, his cooperation reflected resignation to the legal consequences he knew he faced rather than contrition.

In addition, Black's appearance on an online platform that views January 6 offenders as persecuted patriots further demonstrates that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his extremist ideations and belligerent rhetoric and an approaching Presidential-election cycle that, regrettably, has the potential for more violent conflict.

---

[11] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

Here, the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence.   The Guidelines unquestionably provide the most helpful benchmark and are a powerful driver of consistency and fairness.   However, in appropriate circumstances, a variance from the applicable Guidelines range may be warranted when considering the § 3553 factors.

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Black and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to the same offenses in other cases that did not arise from the January 6 riot at the Capitol.   To try to mechanically compare other defendants before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As noted above, Black was found guilty of Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. § 1752(a)(1), (b)(1)(A) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. § 1752(a)(2), (b)(1)(A) (Count 3); Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(1)(A) (Count 4); Entering and Remaining on the Floor of Congress under 40 U.S.C. § 5104(e)(2)(A) (Count 5); and Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D) (Count 6).   As of the date of this sentencing memorandum, undersigned counsel are unaware of any other Capitol rioter who has been sentenced post-trial where her or his most serious counts of conviction involved one or more violations of any subsection of 18 U.S.C. § 1752 and a felony weapon offense, as is the case here.   But the sentences for four defendants who were found guilty of a violation of 18 U.S.C. § 1512(c)(2) and who committed conduct comparable to Black's may be instructive.   These defendants each received sentences of incarceration ranging from 24 to 60 months.[12]

First, in *United States v. Larry Brock,* 12-cr-00140 (JDB), Judge Boasberg sentenced the defendant to 24 months in prison.[13]   In the days and weeks leading up to January 6, Brock, a

---

[12] Each of these defendants, like Black, had a criminal-history category of I.

[13] Following a bench trial, Brock was found guilty of six counts: (1) Obstruction of an Official Proceeding (18 U.S.C. §§ 1512(c)(2) and 2); (2) Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); (4) Entering and Remaining on the Floor of Congress (40 U.S.C. § 5104(e)(2)(A)); (5) Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)); and (6) Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).   At sentencing, the court found that the specific offense characteristic at U.S.S.G. § 2J1.2(b)(1)(B) ("offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice"), which adjusts the offense level +8, did not apply.   While Brock engaged in extreme, violent rhetoric in the days and weeks leading up to January 6, he did not display any violence on the day of the riot, admonished others not to be destructive or disrespectful, and broke up some violence between other rioters and police officers.   Therefore, Brock's applicable Guidelines sentence range was 24-30 months in prison. The court also credited Brock's successful military service in imposing its sentence.

retired United States Air Force lieutenant colonel, grew increasingly angry about the 2020 Presidential election and proclaimed on Facebook that the election was stolen.   He also opined, "Congress can stop it on the 6th of January," and posted a slew of extremist comments, including a remark that "[i]f the President calls, I will answer. #OathKeeper," and an exhortation to "execute the traitors that are trying to steal the election, and that includes the leaders of the media and social media aiding and abetting the coup plotters."   Brock bragged to his friends about purchasing tactical gear in anticipation of January 6, and he "preferred outright insurrection at this point."

On January 6, Brock, dressed in that tactical gear, entered the building at the Senate Wing Door at 2:24 p.m., approximately 12 minutes after that entryway was breached.   He witnessed from inside the Capitol, but did not participate in, the Rotunda Doors breach, and picked up a nearby set of discarded plastic flex-cuffs, commonly used as hand restraints.   He made his way to the Senate Wing and assumed a leadership role.   He told other rioters outside the Senate Gallery not to destroy anything.   Around the same time as Black, he entered the Senate Chamber, toting the flex-cuffs.   He loudly proclaimed, "This is our house," admonished a fellow rioter not to sit in the Vice President's chair on the Senate dais, and lectured his fellow rioters in the Chamber that they were waging an "I.O. war" and "information operation."   During his initial minute or so in the Chamber, Black tagged along with Brock and aped his admonitions to others.   As with other rioters, including Black, Brock rummaged through papers on Senators' desks.   Brock spent about eight minutes on the Senate Floor before leaving the Chamber.   Shortly before exiting the Capitol at 3:02 p.m., Brock broke up an altercation between a rioter and a police officer.

Black's and Brock's conduct is similar in that they both breached the Senate Chamber—one of the most sensitive spaces in the Capitol and the entire federal government—and admonished others not to be disrespectful there.   They also both discouraged violence against and harassment

41

of officers during isolated incidents at areas outside the Chamber.   Brock's online rhetoric leading up to January was much more violent and extreme—and more aggravating—than Black's statements at the Capitol and on social-media platforms.   But several other factors are more aggravating for Black.   Black was the first rioter to breach the Lower West Terrace barricade at 12:57 p.m., an act of initiative that encouraged other rioters to overrun the entire Terrace and drew them closer to breaching the Capitol itself.   Black participated in the heave-ho maneuver and violent breach at the Rotunda Doors; Brock was merely an onlooker to that incident.   Black accosted two USCP officers after they had been attacked in the Senate Gallery hallway by shouting menacing language at them; Brock admonished rioters not to be destructive in that same hallway. Black spent over 20 minutes in the Senate Chamber, participated in Jacob Chansley's shameful "prayer" at the Senate dais, and did not leave until MPD officers forced him out at 3:09 p.m.; Brock spent only eight minutes in the Chamber and exited the Capitol by 3:02 p.m.   Black committed all his conduct while armed with a concealed dangerous weapon; Brock, while openly carrying flex-cuffs he had picked up by the Rotunda Doors, was unarmed.   All told, Black deserves a more significant period of imprisonment than Brock.

Second, in *United States v. Kevin Seefried,* 21-cr-00287 (TNM), Judge McFadden sentenced the defendant to 36 months in prison.[14]   Seefried and his son, Hunter, entered the

---

[14] Following a bench trial, Seefried was found guilty of five counts: (1) Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. §§ 1512(c)(2) and 2); (2) Entering or Remaining in any Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds (40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).   At sentencing, the court determined that the enhancements at U.S.S.G. § 2J1.2(b)(1)(B) ("offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice") and U.S.S.G. §2J1.2(b)(2) ("offense resulted in substantial interference with the administration of justice") did not apply, yielding a sentencing range of 15-21 months in prison.   The court varied upwards in imposing a sentence of 36 months.

restricted Capitol grounds and climbed over a wall near scaffolding and an external staircase of the Capitol building.   After rioters breached a staircase barrier that officers tried to maintain, Seefried and Hunter joined a mob attempting to breach the building near the Senate Wing Door. Seefried watched as the rioters violently broke a window near the Door and Hunter cleared out the remaining glass shards and jumped through the window.   Seefried followed shortly thereafter, carrying a Confederate battle flag, and within a minute of entering the Capitol, placed himself at the front of the mob, where he jabbed at a lone African-American USCP officer with his Confederate flagpole and chased that officer up a flight of stairs in the Senate Wing.   Along with other rioters, Seefried berated and harassed several USCP officers who had arrived to prevent the mob from advancing farther in the Wing's Ohio Clock Corridor.   He stood resolute with the rioters, who demanded to know the location of the Senators and Representatives who gathered for the certification proceeding.   He attempted to engage with one police officer on the scene, asking him why he wanted to work for "liars and thieves."   During the 25 minutes that he remained inside the Capitol, Seefried repeatedly ignored the officers' orders to leave.   On January 11, 2021, Seefried voluntarily turned himself in to the FBI after seeing his picture in media reports.   He gave a voluntary interview with the FBI, and although he minimized his conduct, he admitted that his unlawful entry of the Capitol was wrong.

Seefried's aggressive accosting of officers and carrying a historic symbol of racism and secession was deplorable, and his prolonged confrontations with officers were more aggravating than Black's brief episode of shouting at the attacked officers who retreated down the East Gallery Staircase.   Black also exhibited decency toward officers in two instances, which Seefried did not. Still, Black's behavior is more aggravating in some other respects.   Black witnessed a prolonged series of harrowing assaults on officers at the Rotunda Doors and still participated in the heave-ho

and breach there.   Black's incursion inside the Capitol was more serious, as he breached and remained in one of the most sensitive areas, the Senate Chamber, for over 20 minutes, poked at a laptop, and rifled through a Senator's papers.   Black also remained on the West Plaza of the Capitol grounds until nightfall, after hours of combat between police officers and violent, obstinate rioters.   Further, while Seefried admitted to the FBI that his conduct was wrong, Black has never done so; indeed, to date, he has only expressed pride for his conduct.   Black deserves a sentence greater than 36 months.

Third, in *United States v. Jacob Chansley,* 21-cr-00003 (RCL), following a guilty plea, Judge Lamberth sentenced the defendant to 41 months in prison.[15]   During the weeks leading up to January 6, Chansley used his social-media presence to spread the type of false information and hateful rhetoric that led thousands of rioters to descend on the Capitol on January 6.   While at the Capitol on January 6, he carried a bullhorn and an American flag tied to a pole with a spear tip. On the West Plaza, he climbed a media tower erected for the upcoming Presidential inauguration. He pushed past a police line and was among the first 30 rioters to enter the Capitol when he crossed the threshold of the Senate Wing Door at 2:14 p.m., approximately one minute after rioters smashed windows and forcibly breached there.   He proceeded to the second floor of the Senate Wing, where he was met by USCP officers who directed him and other rioters to exit the building. Chansley riled up other rioters with his bullhorn and demanded that lawmakers be brought out. He made his way to the Senate Gallery, where he bellowed a series of chants and obscenities— including, "Time's up, motherfuckers"—causing Black, who was on the Senate Floor, to yell up

---

[15] Chansley pleaded guilty to one count of Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)).   Due to his acceptance of responsibility, the court applied a three-level reduction, resulting in an adjusted offense level of 22 and a Guidelines sentencing range of 41-51 months in prison.   Without the three-level reduction, Chansley's sentencing range would have been 57-71 months, the same range Black now faces.

to him, "Quit acting a fool."   Eventually, Chansley carried his bullhorn and makeshift spear into the Senate Chamber.   He immediately proceeded to the dais and took the seat that Vice President Pence had occupied less than an hour earlier.   Like Black, he disregarded Officer Robishaw's requests to leave this "sacredest place."   Chansley wrote an ominous message that he left on the Vice President's desk—"ITS [*sic*] ONLY A MATTER OF TIME JUSTICE IS COMING!"—and led others, including Black, in his spectacle "prayer" from the dais.   Along with Black, Chansley vacated the Chamber when the column of MPD officers arrived, and exited the building approximately one hour after he had entered.   During one of the interviews he gave to media outlets after January 6, Chansley stated, "The fact that we had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win."

Black and Chansley engaged in comparable conduct.   Both were at the vanguard of critical breaches that encouraged others to escalate their attack on the Capitol: Black was the first to breach the Lower West Terrace barricade at 12:57 p.m., and Chansley was among the first to break into the building at 2:14 p.m.   Both expressed their disgust for lawmakers: among myriad other statements about "crooked" and "dirt bag[]" politicians, Black claimed he told Officer Carrion he and the rioters needed "to show these politicians that we mean business," and Chansley faced off with USCP officers in the Ohio Clock Corridor to demand that Congressmembers be brought out. Both shouted ominous language to authorities in the Capitol's Senate Wing, with Black targeting retreating USCP officers at the East Gallery Staircase, and Chansley spewing his more generalized threats and obscenities in the Ohio Clock Corridor, Senate Gallery, and Senate Chamber.   Both carried bladed weapons into the Capitol, though Black's remained concealed.   Chansley spent about an hour inside the Capitol, as compared to about 30 minutes for Black, though Black spent

about double the time in the Senate Chamber as Chansley did.   Both used social media to publicize their thoughts about how the Presidential election was fraudulent and to rail against the "crooked" politicians, though Chansley's online musings were more extensive and strident.   In at least one respect, Black's conduct was more egregious because he witnessed up-close the attack on officers at the Rotunda Doors and still participated in that violent breach.   Regrettably, both became iconic representatives of the Capitol Riot and are infamously linked by their conduct in the Senate Chamber.   Chansley led the "prayer"—a lawless bacchanal—inside the Chamber, which Black readily joined.   Notably, following that shameful display, Chansley exhorted other rioters to cheer Black, whom Chansley admired as a "fucking champ."   Therefore, Black and Chansley are suitable comparators, and Black warrants a sentence within the range that would have applied to Chansley had he not received a reduction for accepting responsibility.

Fourth, in *United States v. Anthony Williams,* 21-cr-00377 (BAH), Judge Howell sentenced the defendant to 60 months in prison.[16]   Leading up to January 6, Williams issued a series of social-media posts expressing his anger about the election results and stating his intention to go to the Capitol to stop the certification of the election results.   At the Capitol, he joined a group of rioters on the West Front and helped them climb bicycle racks to flank and overrun the police on the northwest stairs.   Williams recorded himself and bragged, "We just stormed the stairs of the

---

[16] Following a jury trial, Williams was found guilty of five counts: (1) Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. § 1512(c)(2) and 2); (2) Entering or Remaining in any Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); (4) Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)); and (5) Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).   At sentencing, the court determined that the enhancements at U.S.S.G. § 2J1.2(b)(1)(B) ("offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice") and U.S.S.G. §2J1.2(b)(2) ("offense resulted in substantial interference with the administration of justice") both applied, yielding a sentencing range of 57-71 months in prison.

Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody.   Fuck that, we took this fucking building."   He then stole water bottles USCP officers had stored on the Upper West Terrace to decontaminate officers doused with chemical irritants.   Williams entered the Capitol through the Senate Wing Door only six minutes after its breach.   Along with other rioters, he overran police in the Crypt and advanced to the Rotunda, where he celebrated and smoked marijuana.   When the police tried to force him out of the Rotunda, he actively resisted and mocked the police.   After participating in the riot, he bragged on social media about his actions and proclaimed that January 6 was the proudest day of his life.

While Black and Williams were involved in different types of conduct at different sites at the Capitol, they are suitable comparators.   In different—but similarly aggravating—ways, they resisted officers' commands not to advance on the building and to leave the Capitol.   Both took aggressive action to overwhelm officers and gain entry into the building.   Both were among initial groups of intruders at critical points; Black was the first to breach the Lower West Terrace barricade, and Williams was part of the first wave of breachers at the Senate Wing Door.

While Black did not steal property from police officers or use a controlled substance in the Capitol, his incursion into the Senate Chamber posed a greater security threat and he seized a sensitive certification document from a Senator's desk and attempted to get into a Senate staff's laptop.   Though Williams engaged in more physical resistance to officers' attempts to clear the Rotunda, Black participated in the heave-ho and the harrowing breach at the Rotunda Doors, a singularly aggravating factor.   Both men expressed pride for their conduct and disdain for the rule of law on social media, albeit Williams did so more crassly.   Black's circumstances are more mitigating in that Williams had prior convictions for stale crimes, though he still had a criminal-history category of I for Guidelines purposes, and Black was more cooperative with the FBI

leading up to his arrest.   At any rate, both men's conduct warrants a 60-month sentence.

Accordingly, a sentence of 60 months for Black would not create an unwarranted disparity.[17]

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in § 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.   *Hughey v.*

---

[17] A table providing additional information about the sentences imposed on other January 6 defendants is available at www.justice.gov/file/1567746/download.   This continuously updated table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence,"   § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim [. . .] has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h).   That latter approach is appropriate here.

More specifically, the Court should require Black to pay $2,000 in restitution for his convictions on Counts 2 through 6.   This amount fairly reflects his role in the offense and the

damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed-upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Black's felony convictions under Sections 1752 and 5104 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   Due to Black's apparent receipt of donations from the *Lumberjack Logic* podcast, the government requests that the Court impose a fine equivalent to the amount he realized from those contributions, which appears to be at least $807.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Black to 60 months in prison, which is a low-range sentence within the Guidelines calculation that the USPO and the government agree applies here, restitution of $2,000, a fine equivalent to the contributions he received from his podcast appearance, and the mandatory $320 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

50

By:   */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
D.C. Bar No. 976587
202-252-5847
seth.meinero@usdoj.gov

   */s/ Emily Allen*
EMILY ALLEN
Assistant United States Attorney
California Bar No. 234961
emily.allen@usdoj.gov

   */s/ Eric Boylan*
ERIC BOYLAN
Assistant United States Attorney
Texas Bar No. 24105519
eric.boylan@usdoj.gov

United States Attorney's Office for the
 District of Columbia
601 D St., N.W. - Room 6.1524
Washington, DC 20530

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 28, 2023, I served a copy of this pleading on all parties

to this matter as indicated in the Court's electronic case files system.

   */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)