**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA** | : | |
| | : | |
| Plaintiff | : | |
| | : | Criminal Case No.: 21-CR-00127 |
| *v.* | : | |
| | : | |
| **JOSHUA MATTHEW BLACK** | : | |
| | : | |
| Defendant | : | |

.......................................................................................................................................

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, **JOSHUA MATTHEW BLACK,** by and through his attorney, Clark U. Fleckinger II, respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence which is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005). Pursuant thereto, Mr. Black would respectfully request that the Court impose a sentence which requires no further imprisonment.

**I.      Relevant Personal and Case Background**

Joshua Black is a 47-year-old Alabama resident who was indicted for various offenses arising out the misguided political events of January 6, 2021 connected with the November 2020 election of President Biden and the transition of the Presidential administration of then President Trump to the administration of President Biden.

Mr. Black married Tammy Black (nee: Moss) in 2005 and they lived together as husband and wife, with her now 28-year-old son (Charlie Wood) from a previous relationship, until the parties divorced in 2014. Shortly thereafter, the parties reconciled and resumed their marital relationship without the benefit of a formal remarriage. They continue

1

to reside with each other in Leeds, Alabama, with Mr. Black's stepson, in a loving relationship.  Mr. Black has fathered no children of his own but has helped to raise his stepson as his own.

Mr. Black dropped out of high school in 1994 but obtained his GED shortly thereafter.  He runs his own lawn mowing and maintenance business which grosses roughly $24,000 annually.

Around 2010 Mr. Black was "born again" and became part of the evangelical Christian community.  It has been a major component of Mr. Black's life since.  He has attempted to carry out what he perceives to be God's will with a charitable and loving heart toward his family, neighbors and community.  He disavows violence although he acknowledges having made politically rhetorical statements on January 6, 2021 and in the week thereafter which might suggest the contrary.

Although Mr. Black was not particularly politically engaged for most of his life, and despite having voted for President Obama during those Presidential elections, at some time before the 2016 Presidential election Mr. Black began consuming political and social information through conservative media sources.  As a result, he became more politically engaged and supported much, but not all, of the "Make America Great Again" agenda of President Trump.   In the aftermath of the 2020 Presidential election, he listened to conservative media accounts of perceived problems with the integrity of the election.

On January 6, 2021 a rally of then President Trump took place in Washington, DC intended to be supportive of President Trump.  Mr. Black traveled to Washington, DC, alone, from his home in Alabama in order to be supportive of President Trump.  On the way, he stopped in Dalton, GA for a rally for then Georgia Senators Loeffler and Perdue who were involved in a run-off election stemming from the Georgia Senatorial election of 2020.

President Trump was present at that rally.  The Georgia rally was non-violent.  When he, thereafter, traveled to Washington, DC, Mr. Black anticipated that the January 6 rally in support of then President Trump would be similarly non-violent.  He had no anticipation that the January 6 rally of Trump supporters would evolve as it did.

Mr. Black attended the morning portion of the January 6 rally outside the enclosure that was set up around the speakers at the rally.  He was able to hear portions of the various speeches being given but not all of the speeches.  Before those speeches were over, he heard from persons in the vicinity that President Trump supporters were going to the Capitol to protest what was perceived by President Trump supporters to be a fraudulent Presidential election result.  He walked, by himself, to the Capitol in order to see what was taking place.  He had no anticipation at the time that the rally would become as violent and as destructive as it did.  He had no anticipation at the time that he would later enter the Capitol or make his way onto the Senate floor.

When he arrived at the Capitol, he was initially near the front of a make shift police barricade at the West Terrace of the Capitol.  Other President Trump supporters continued to arrive at that location which become more and more crowded behind him and which was slowing surging toward the police barricade.  Mr. Black acknowledges that he stepped over the police barricade and went several steps beyond when he was directed by a law enforcement officer to stop and return to a point behind the barricade.  He did.  The Government contends that Mr. Black was the first to breach the barricade at the West Terrace and that that breach was the impetus for others in the crowd to breach that barricade about a minute later.  Mr. Black does not know if he was the first to breach that barricade but he submits that the Government's contention that Mr. Black's breach was the impetus for the

crowd breach that followed is substantially speculative.   Nevertheless, Mr. Black acknowledges the impropriety of that breach.

During his time at the West Terrace, and while he was in the crowd, he was shot by a law enforcement officer from above the West Terrace with a less than lethal projectile. The projectile pierced his left cheek and created a hole in the cheek which was bleeding and for which Mr. Black later received medical attention from law enforcement.   When Mr. Black was shot, the crowd became more unruly than they were before.   The crowd became more combative with the police although Mr. Black did not.   A police officer went to the ground and was being assaulted by others in the crowd.   Despite Mr. Black having recently been shot as referenced above, he got on top of the downed officer in order to protect him from the crowd while verbally pleading with the crowd not to hurt the officer.   Shortly thereafter, Mr. Black was medically assisted by law enforcement for the injury to his cheek in an area beyond the barricade.   A law enforcement officer's account discussed *infra* indicates that, while there, Mr. Black urged the crowd of President Trumps supporters to "lay off" the police and that they were just doing their job.   That account from that officer also indicated that Mr. Black's above referenced admonition to the crowd seemed to have a calming effect on many in the crowd.   At some point in time during that period he asked the officers in that vicinity if he could prayer for them.   The officers acquiesced to that request and Mr. Black prayed for them.

Mr. Black left the area of the West Terrace and made his way around the Capitol to the east side of the building.   Although not initially part of the crowd that was forming at the East Rotunda doors to the Capitol through which Mr. Black later entered, he did join that crowd.   He submits that he was directed by God to do so.

4

Mr. Black was part of the crowd that pushed their way into the Capitol through the East Rotunda doors and, although he was not a voluntary participant in what the Government has characterized as the "heave ho" effort by the crowd to enter the Capitol through those doors, he did enter the Capitol at that location. During his review of the discovery produced to the defense, as well as during the trial testimony of Officer Mark Carrion during which a video of the activity at the East Rotunda doors was shown, Mr. Black recognized, for the first time, the traumatic impact that those events must have had on Officer Carrion and other law enforcement officers at that location. Following Officer Carrion's trial testimony, Mr. Black wanted to apologize directly to Officer Carrion for having been a part of the crowd that contributed to the trauma. Given the posture of this matter at the time that that sentiment was expressed by Mr. Black he did not make that apology then. He is making it now to Officer Carrion and other law enforcement officers present at the Capitol on January 6. His regret for having contributed to that trauma is heartful and is antithetical to his faith.

After entry into the Capitol, Mr. Black went through the various corridors of the building. He did not know where he was going but followed the crowd. He entered a vestibule by himself in which there was a locked door leading to the Senate Chambers. When he could not open the door, he turned around and, at a desk in the vestibule, knelt at the desk and prayed for a couple of minutes before others in the crowd came into the vestibule. Those prayers were part of his effort to "plead the blood of Jesus" at the Capitol in order to atone for the sins of what he perceived to be the corruption of both Democratic and Republican Party politicians who served at the Capitol.

He ultimately entered the Senate floor with others who had entered the Capitol and stayed there for about 20 minutes before a contingent of law enforcement officers arrived and directed all of those then on the Senate floor to leave. The Government has alleged that,

while there, Mr. Black rummaged through the collective personal papers of the Senators. The video evidence presented at trial suggests that that allegation is somewhat embellished. There is evidence that he touched an open but turned off lap top on a Clerk's desk and later walks toward a man holding a document. Mr. Black looks at the document but does not touch it. Shortly thereafter he goes toward a group at the desk of Senator Cruz. One of the persons in that group is holding a document. That document is Senator Cruz's and Congressman Gosar's objection to certification of the electoral votes of Arizona. Mr. Black looked at the document and took a picture of it and put it back.

While on the Senate floor, Mr. Black was admonishing other protestor's there to be more respectful of the institution and to refrain from destructive conduct. He admonished another protestor, Jason Chansley, to "stop acting the fool" when Mr. Chansley was chanting gibberish in the balcony above the Senate floor. A New Yorker article by freelance reporter, Luke Mogelson, who was on the Senate floor at the time that Mr. Black was there recounts how Mr. Black was a calming and respectful influence on other protestors that were on the Senate floor at that time.

Shortly before the contingent of law enforcement officers arrived and herded the protestors, including Mr. Black, off the Senate floor, Mr. Black was sitting on the floor in front of the Senate dais conversing with his father on his cell phone. Mr. Black acknowledges the impropriety of having passively disregarded the "request" of Officer Keith Robishaw to leave the Senate floor at that time. That disregard was not intended to be disrespectful to Officer Robishaw.

In any event, while still sitting on the floor, Mr. Black heard someone leading a prayer. Given his faith, Mr. Black stood up with his eyes closed and raising his hands in silent prayer. While his presence on the Senate floor at that time and under those

circumstances was certainly inappropriate and illegal, his silent participation in prayer was not the raucous, disorderly and disingenuous display that the Government suggests.  When the contingent of law enforcement officers arrived to remove the protestors from the Senate floor Mr. Black complied with their directive without resistance.

Mr. Black returned home to Alabama the following day.  While driving home he contacted the FBI on his cell phone.  His involvement with the criminal justice system is recounted in that portion of this memorandum, *infra,* which advocates for a 2-level downward adjustment from the applicable U.S. Sentencing Guidelines pursuant to §3E1.1 of the Guidelines.

## II.      Presentence Report and Guideline Calculation

Both the PSR as prepared by U.S. Probation and the Government submit that an accurate Guideline calculation for Mr. Black is one in which Mr. Black falls into Criminal History Category I[1] and an adjusted offense level of 25 and, accordingly, a Guideline sentencing range of 57 to 71 months.  However, inasmuch as Count 4 of the indictment (18 USC §§5104(e)(1)(A) and 5109(a), Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings) for which Mr. Black was found guilty carries a maximum sentence of 5 years, the maximum Guideline compliant sentence is capped at 60 months.[2]  Pursuant to that 60 month Guideline cap restriction, the Government submits that the maximum Guideline sentence that could be imposed should be imposed.  Nevertheless, U.S. Probation and the Government arrive at their adjusted offense level of 25 by different methods.  Mr. Black disagrees with both methods.

---

[1] Mr. Black has no prior convictions and, accordingly, has 0 criminal history points.  Mr. Black agrees with that aspect of the calculation but diverges from the PSR and the Government's Guideline in almost every other aspect.
[2] *See,* PSR, ¶ 106, *citing* USSG §5G1.1(c)(1).

The PSR contends that Counts 2 (18 USC §§1752(a)(1) and (b)(1)(A), Entering and Remaining in a Restricted Building or Grounds with a Dangerous or Deadly Weapon) and 4 (40 USC, §5104(e)(1), Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings constitute one group and that Count 3 (18 USC §§1752(a)(2) and (b)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous or Deadly Weapon) constitutes a distinct group which implicate the grouping concepts of the Guidelines.[3]   The basis for the PSR's grouping contention is that the 2 groups of offenses have different victims.   The PSR contends that the victim as to Counts 2 and 4 is Congress while the victim as to Count 3 is law enforcement.

The Government contends that the victims as to all Guideline relevant counts[4] is the same – Congress.

Mr. Black agrees with the Government's position.   The victim as to all Guideline relevant counts is Congress.   The grouping issue is relevant to Mr. Black's Guideline calculation.

While both the PSR and the Government ultimately arrive at the same adjusted offense level of 25, the PSR contends that the Guideline section establishing the base offense level is USSG §2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility; Possession or Discharge of Firearm in School Zone) based on Mr. Black's conviction on Count 4 (Possession of a Dangerous Weapon) which establishes a base offense level of 6. The cross reference sub-section of that Guideline[5] indicates that, if the defendant possessed the weapon "in connection with the commission or attempted commission of another

---

[3] *See,* PSR, ¶s 41 – 43.
[4] Counts 5 (40 USC §5104(e)(2)(A), Entering and Remaining on the Floor of Congress) and 6 (40 USC §5104(e)(2)(D), Disorderly Conduct in a Capitol Building) are misdemeanors and, accordingly, are not part of a Sentencing Guideline calculation.  *See,* PSR, ¶ 40.
[5] USSG, §2K2.5(c)(1)(A).

offense," USSG §2X1.1 (Attempt, Solicitation, or Conspiracy)(Not Covered By A Specific Offense Guideline)) should be applied.   That guideline requires application of the base offense level applicable to the "other" offense.   The other offense which the PSR indicates should be used as the offense which establishes the base offense level under §2X1.1 is Obstruction of an Official Proceeding in violation of 18 USC §1512(c)(2), the indicted offense for which Mr. Black was acquitted.   Accordingly, the PSR contends that USSG §2J1.2 (Obstruction of Justice), with a base offense level of 14, should apply in order to establish the base offense level together with the enhancements contained therein thereby increasing the adjusted offense level by an additional 11 levels.[6]   The PSR applies the Obstruction of Justice guideline on the basis that the evidence adduced at trial established that Mr. Black committed the offense of Obstruction of an Official Proceeding, the offense for which he was acquitted, by a preponderance of the evidence.[7]

The PSR also contends that conviction on Count 3 implicates a separate offense group and a separate base offense level calculation should be undertaken for that group. Specifically, because the PSR contends that the victim of Count 3 is law enforcement, USSG §2A2.4 (Obstructing or Impeding Officers) should apply to establish a base offense level of 10 and the enhancements contained therein.[8]

---

[6] *See,* PSR, ¶s 43 – 50.

[7] Mr. Black recognizes that there is legal authority which would permit a sentencing court to impose a sentence, or calculate a Guideline compliant sentence, considering acquitted conduct if the acquitted conduct has been established by a *preponderance of the evidence*.   The Court has made no findings that the Government established that Mr. Black committed Obstruction of an Official Proceeding by a preponderance of the evidence and it is submitted that, but for the Government's contention that the evidence adduced at trial established commission of that offense by the preponderance standard, U.S. Probation is not in a position to posit that contention.   Mr. Black disputes that the Government established commission of that offense by that lesser standard and, further, for reasons discussed *infra,* submits that the Obstruction of Justice guideline should not be used to establish the base offense level or the enhancements associated with that guideline which, according to §2X1.1(a), must be established *with reasonable certainty*.

[8] *See,* PSR, ¶s 51 – 56.   As noted previously, like the Government, Mr. Black contends that the victim of Counts 2, 3 and 4, was Congress and not law enforcement and, accordingly, grouping does not apply.   *See,* Government's at P. 28.   Therefore, application of the Obstructing or Impeding Officers does not apply whether as part of a grouping calculation or as part of a single unit calculation.

The Government has undertaken a base offense level analysis of each of the relevant counts of the indictment for which Mr. Black was convicted. They contend that the base offense level for Count 2 of the indictment is initially established by reference to USSG §2B2.3 (Trespass) which has a base offense level of 4.[9]  However, they contend that the cross reference to that guideline found at §2B2.3(c)(1) applies. That sub-section indicates that if the offense (Entering and Remaining in a Restricted Building or Grounds with a Dangerous Weapon) – a felony - was committed with the intent to commit a felony, USSG §2X1.1 (Attempt, Solicitation or Conspiracy (Not Covered By A Specific Guideline)) should be applied so as to establish the base offense level by using the felony that the defendant intended to commit. The Government contends that the felony that Mr. Black intended to commit was Obstruction of an Official Proceeding and, accordingly, USSG §2J1.2 establishes the base offense level of 14 together with the enhancements contained therein.[10]

The Government next contends that the base offense level for Count 3 is established by reference to USSG §2A2.4 (Obstructing or Impeding Officers) and that the base offense level for that offense is 10 in addition to what they contend is the applicable enhancement for an adjusted offense level of 13.[11]  The Government's contention that the Obstruction or Impeding Officers guideline is the relevant guideline to establish the base offense level for Count 3 is misguided in light of their recognition that the victim of Mr. Black's violation of Count 3 was Congress, not law enforcement. Accordingly, Mr. Black submits that §2A2.4 (Obstructing or Impeding Officers) is not applicable.

---

[9] *See,* Government Sentencing Memorandum, P. 19 – 26.
[10] The Government contends that, notwithstanding the acquittal of Mr. Black for Obstruction of an Official Proceeding, the evidence established that Mr. Black committed that offense by a preponderance of the evidence. No such finding has been made and, for reasons discussed *infra,* Mr. Black submits that such a finding should not be made.
[11] *See,* Government Sentencing Memorandum, P. 26.

Finally, the Government contends that the base offense level as to Count 4 is established by reference to USSG §2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility; Possession or Discharge of Firearm in School Zone) which, again, establishes a base offense level of 6. However, pursuant to the cross reference of §2K2.5(c)(1)(A), the Government contends, as did the PSR, that §2J1.2 (Obstruction of Justice) applies. As previously submitted, and while Mr. Black recognizes that application of §2K2.5 should apply to determining the base offense level for Count 4, he disputes that the cross reference should apply so as to implicate §2J1.2.

The entire premise of both the PSR's and the Government's contention that §2J1.2 should apply so as to establish both the base offense level and the enhancements associated therewith is that the Government adduced evidence which established that Mr. Black committed Obstruction of an Official Proceeding by a preponderance of the evidence. As an initial proposition, the PSR is simply regurgitating the advocacy of the Government thereby implicating either the cross reference to §2B2.3 (Trespass) or §2K2.5 (Possession of Firearm or Dangerous Weapon in Federal Facility; Possession or Discharge of Firearm in School Zone) *and* that Mr. Black was *intending* to commit that felony offense as opposed to the felony offenses of which he was actually convicted. That regurgitation, both with respect to the state of the evidence and the intended felony which was the object of the conduct, does not make it so.

Similarly, and in that same vein, Mr. Black submits that the neither the Government's references to the political rhetoric spewed by him on and in the immediate aftermath of January 6, as well his conduct on January 6,[12] does not establish, by a preponderance of

---

[12] Mr. Black does not dispute that his conduct at the Capitol on January 6 went far beyond acceptable political protest and civil disobedience. That having been said, Mr. Black submits that the Government's references in their Sentencing Memorandum to specific conduct of him, both outside and inside the Capitol, have been substantially embellished by the Government in an apparent attempt to cast that conduct, admittedly criminal

the evidence, that Mr. Black intended to commit Obstruction of an Official Proceeding.[13]

Mr. Black has never denied having said what the Government put into evidence or his

presence at the Capitol and on the Senate floor.   But, the Government's Sentencing

Memorandum account of the evidence adduced at trial is not the entirety of the evidence

which was, or was not, adduced.   Despite the absence of presenting a formal defense, the

Court heard and saw evidence that Mr. Black's intent was spiritual, that he intended to "plead

the blood of Jesus" on the Senate floor so as to foster Congressional atonement for what he

perceived to be the transgressions of corrupt Democratic Party and Republican Party.

During the various video evidence presented by the Government of his conduct while at and

inside the Capitol and while on the Senate floor in his You Tube presentations following his

return to Alabama, he spoke of having been directed by God to both travel to Washington,

DC, go to and inside the Capitol and go to the Senate floor.   The same is true of his January

8 and January 14 admissions to the FBI.   That evidence was replete with references to his

spiritual motivation to be present at the Capitol and showed him praying outside the Senate

Chambers prior to his entry onto the Senate floor and praying again while on the Senate

floor.[14]

Last in this regard, and beyond the spirituality issue referenced above, it is important

to note that prior to the events of January 6 which led to the entry of the Capitol, people in

the crowd were indicating that "Pence turned on us and they had stolen the election, like

officially."   Accordingly, the evidence presented by the Government suggests that Mr. Black

---

in the grand scheme of all that happened on January 6, as having been carried out with a more sinister intent
than what is justified by a review of the evidence presented at trial.
[13] *See,* Government Sentencing Memorandum, P. 24.
[14] The Government has described Mr. Black as having "joined a disorderly spectacle disguised as prayer[,]"
while on the Senate floor.  While it is true that Mr. Black joined what he perceived to be prayer, he did so in
silence and without any disorderly conduct on his part.  In any event, the Government seems to imply that Mr.
Black's spirituality is disingenuous.

had reason to believe that the certification proceeding had been completed.  The reasonable inference to be drawn from such a belief is that the proceeding which was the subject of Count 1 of the indictment charging Mr. Black with Obstruction of an Official Proceeding was over and, accordingly, there was no proceeding pending which would be the subject of an obstruction.

Undersigned counsel recognizes that, while Mr. Black's spiritual motivation was evident while at the Capitol on January 6, he was also motivated by political support for Donald Trump as were the thousands of others who were present that day in support of then President Trump.  Over a thousand people have been arrested as a result of their participation in the events of January 6 and who shared substantially the same political perspective as Mr. Black.  They were not all intending to obstruct the electoral vote certification proceeding and not all of those who were arrested were charged with Obstruction of an Official Proceeding.  Presumably that is for the reason that the Government recognizes that political perspective, political rhetoric and entry onto the Capitol grounds and into the Capitol itself in support of a political figure does not necessarily equate with the intent to obstruct an official proceeding – particularly a proceeding which in the mind of Mr. Black was complete at the time of his conduct and his political rhetoric on January 6 and in the days thereafter. In any event, and to be clear, for purposes of the appropriate application of the U.S. Sentencing Guidelines, Mr. Black is not disavowing the Court's finding of guilt as to the felonies for which he is to be sentenced.  Mr. Black's position in this regard is that he is not guilty of Obstruction of an Official Proceeding by either a reasonable doubt standard or by a preponderance of the evidence standard which may, arguably, justify application of §2J1.2 to establish the base offense level from which to further calculate the adjusted offense level.

Rather, to the extent that the cross reference of §2B2.3 (Trespass) on Count 2 is implicated, it should be to either of the felonies in Counts 3 or 4.[15]

In addition, while the Government correctly cites *United States v. Watts,* 51 U.S. 148 (1997), for the proposition that a sentencing court may take into account conduct which has not resulted in a conviction or even acquitted conduct provided that the conduct in question has been established by at least a preponderance of the evidence.  Nevertheless, Mr. Black submits that to fashion a sentence pursuant to an application of the Sentencing Guidelines which establishes a base offense level and the applicable enhancements for an offense of which the defendant was acquitted at trial is both fundamentally unfair and arguably violates a defendant's Fifth and Sixth Amendments due process and jury trial rights to the U.S. Constitution.

Notwithstanding the Government's contention of the propriety of using acquitted conduct at sentencing to the contrary, Mr. Black appreciates the Government's recognition that the proposition that a criminal defendant should be sentenced as though he had been found guilty of an offense for which he had been acquitted is a controversial one.  Their citation to the U.S. Sentencing Commission's recent proposed amendment to the U.S. Sentencing Guidelines which would prohibit the use of acquitted conduct in applying the Guidelines evidences that controversy.[16]  Although that proposal was not adopted, the fact that it was proposed at all is a relevant consideration as to whether fashioning a sentence using as the *primary* factor conduct for which the defendant has been acquitted speaks volumes about the issue in the legal community.

---

[15] As previously noted, the cross reference to Count 3 should not be to §2A2.4 (Obstructing or Impeding Officers) because the victim is not law enforcement but, rather, Congress.  Section 2B2.3 is the appropriate guideline to establish the base offense level for Count 3.  The appropriate guideline to establish the base offense level to Count 4 is, obviously, §2K2.5

[16] *See,* Government's Sentencing Memorandum, P. 20, Note 6.

And, it is not only the Sentencing Commission which believes the issue should be reevaluated.  In 2014, Justices Scalia, Thomas and Ginsburg filed a dissent to the majority's denial of a Petition for a Writ of Certiorari from the D.C. Court of Appeals in *Jones v. United States,* 574 U.S. 948 (2014).  The issue was whether a sentencing court should base a substantially lengthier sentence than what would otherwise have been imposed on conduct for which a jury acquitted the defendant.  The dissent in *Jones* indicated that the time had come for the Court to address that issue which is arguably violative of the defendant's Fifth and Sixth Amendment rights.[17]

More recently, when considering the same issue in *United States v. Karr,* 2022 U.S. App. LEXIS 12981, 2022 WL 1499288 (5th Cir, 2022), the Court observed:

> Distinguished jurists have called *Watts* into question.  *See, e.g., Unites States v. Jones,* 574 U.S. 948, 135 S.Ct. 8, 8-9, 190 L.Ed.2d 279 (2014).  (Scalia, J. joined by Thomas, J., and Ginsberg, J., dissenting from denial of certiorari)(encouraging the Court to decide whether the Due Process Clause and the Sixth Amendment's jury trial right permit judge's to sentence defendants based on uncharged or acquitted conduct); *United States v. Sabillion-Umana,* 772 F.3d 1328 (10th Cir. 2014) (Gorsuch, J., majority)(citing Justice Scalia's dissent in *Jones*); *United States v. Bell,* 808 F.3d 926, 928, 420 U.S.App.D.C. 2387 (DC Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing *en banc*) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial.")

*Id.,* at *2, Note 1.

Mr. Black respectfully submits that, even if the Court determines that the Government established by a preponderance of the evidence that Mr. Black is guilty of Obstruction of an Official Proceeding, it would be a violation of both his Fifth and Sixth[18]

---

[17] Mr. Black recognizes that some may suggest that he waived his Sixth Amendment claim by waiving his right to a jury trial in the instant matter.  However, he would submit that if a Court construed the waiver of a jury trial to be a blanket waiver of his Sixth Amendment rights, such a construction would unduly chill his right to a trial by a body appropriate to the issues and, accordingly, should not be construed as a Sixth Amendment waiver.

[18] *See,* Note 17, *supra.*

Amendment rights to impose a Guideline compliant sentence in the above captioned matter by factoring into the Guideline calculation that finding in the case at bar in the face of an acquittal as to that offense.  The Fifth Amendment violation occurs because it uses the acquitted conduct as the *primary* factor in the sentencing process.  Using such acquitted conduct as the *primary* factor in the Guideline calculation in the manner advocated by either the Government or the PSR *potentially* results in a Guideline calculation which exposes Mr. Black to a Guideline compliant sentence of 57 to 71[19] months while a Guideline compliant sentence as calculated by Mr. Black would result in a Guideline compliant sentence of 0 to 6 months as will be discussed *infra.*  Such a Guideline sentencing disparity based upon acquitted conduct being factored into the Guideline calculation would be unconscionable.

In the event that the Court determines that the Government established that Mr. Black committed the offense of Obstruction of an Official Proceeding by a preponderance of the evidence which may then, arguably, be used as establishing the base offense level for the Guideline calculation and that such use does not implicate his Fifth and Sixth Amendment rights, Mr. Black submits that the Court should determine whether the use of the acquitted conduct as the *primary* factor in the calculation of the Guidelines as advocated by both the Government and the PSR promotes the overarching dictates 18 USC §3553 instructing district courts to "'impose a sentence sufficient, but not greater than necessary, 'including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect further crimes of the  defendant.'" *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (*citing, United States v. Booker,* 543 U.S. 220, 245 (2005) and 18 USC §3553(a)).

---

[19] The *potential* of such a sentence is the result of Mr. Black's exposure to the additional two enhancements to by using §2J1.2 in order to establish the base offense level.  Even if neither of those enhancements are applied, using §2J1.2 to establish the base offense level of 14 would produce a Guideline compliant sentence of 15 to 21 months.

Those goals are not advanced by the use of acquitted conduct here.  Notwithstanding his participation in the events of January 6, Mr. Black has respect for the law as his lack of criminal history as well as his post arrest and pretrial conduct would suggest. The imposition of a sentence by this Court which does not use acquitted conduct as the primary factor in the sentencing of Mr. Black for the offenses of which he was found guilty can be fashioned which reflects both the seriousness of the offenses for which he is being sentenced and which provides just punishment.  The legal and liberty difficulties which Mr. Black has already incurred as the result of his participation in the events of January 6 have sufficiently deterred Mr. Black from such conduct in the future and, accordingly, the public does not need to be "protected" from Mr. Black.  And, the significant sentences of imprisonment which have already been meted out to other more egregiously involved participants in the events of January 6 is likely to act as a significant deterrent to the public generally without imposing a harsher sentence than necessary sentence upon Mr. Black.  Mr. Black respectfully submits that the position of both the Government and the PSR advocating for the use of acquitted conduct as the primary factor in the calculation of the Sentencing Guidelines be rejected.

If the Court determines that Mr. Black's submissions with regard to the impropriety of using §2J1.2 as the base offense level is meritorious, it will be unnecessary to address the propriety of the using the enhancements in §2J1.2(b)(1)(B) and (b)(2) and as referenced in Paragraphs 45 and 46 of the PSR.  However, in the event that the Court determines that Mr. Black's submissions in that regard are misguided, it is necessary to address those issues.

If §2J1.2 is used to establish the base offense level in order to calculate the Guidelines, the PSR and the Government[20] advance that §2J1.2(b)(1)(B) should apply in order to increase the base offense level by 8 levels.

---

[20] *See,* Government Sentencing Memorandum, P. 24-26.

That sub-section applies if the offense involved causing or, threatening to cause, physical injury to a person, or property damage, in order to obstruct the administration of justice. Although injuries were sustained by several persons during the events of January 6, and although substantial property was damaged on that day, neither the Government nor the PSR allege that Mr. Black injured any person. To the contrary, there was ample evidence adduced at trial that Mr. Black never assaulted or threatened anyone at all. Moreover, there is evidence that Mr. Black attempt to protect an officer who had gone to the ground and who was being assaulted by others. The Government is well aware of that effort by Mr. Black.

In addition to the evidence adduced at trial which belies the PSR and Government proposition that Mr. Black engaged in or promoted assaultive, threatening, injurious or destructive conduct which they contend should be made the basis of this 8 level enhancement, evidence not adduced at trial but has been provided as a sentencing Exhibit by the Government (*see,* ECF 89-1, a redacted FD 302 of the account of an unidentified officer who encountered Mr. Black initially at the West Terrace of the Capitol at a time when Mr. Black had already been shot through the cheek by a less than lethal projectile and was receiving medical attention by law enforcement), shows that Mr. Black was telling violent and unruly people in the crowd to "lay off the officers and that the officers were just doing their job."[21] That Exhibit further indicates that Mr. Black had a calming influence on the crowd at that point. And, in furtherance of Mr. Black's previous submission that his motivation on January 6 was more spiritual than political, the same sentencing Exhibit indicates that Mr. Black asked if the officer who is the subject of the 302 and other officers in the vicinity if he could pray for them and, upon their acquiescence, did.[22]

---

[21] *See,* Government Sentencing Memorandum, [Redacted] Exhibit 1, P.2 (ECF 89-1).
[22] Mr. Black appreciates the Government's integrity in providing Sentencing Exhibit 1 as some evidence of mitigation.

Despite the fact that Mr. Black was not charged with conspiring with anyone in regard to the alleged Obstruction of an Official Proceeding both the PSR and the Government posit that Mr. Black should be held liable for the actions of others who he had no ability to control and despite efforts to disavow himself of assaultive and/or injurious conduct.  More importantly, there is no evidence which would suggest that he engaged in, or directed, such conduct.  There is nothing in the Application Notes to that guideline section which would suggest that an individual defendant should be liable for the actions of others despite a complete inability to control those actions of others.  Both the Government and the PSR would enhance the otherwise applicable sentence due to the mere presence of Mr. Black within some undefined proximity to where the injury was sustained.  Using that logic, every person who was present at the Capitol on January 6 would be similarly liable for all that took place on January 6.  The majority of those who have been arrested to date have not even been charged with Obstruction of an Official Proceeding let alone been sanctioned as though they had personally committed the injurious conduct.  The Court should reject that basis for an enhancement under §2J1.2(b)(1)(B).

In addition, that subsection is inapplicable because the conduct at issue does not involve the administration of justice.  Both the PSR and the Government indicate that the administration of justice as used in this sub-section includes proceedings in Congress.  Again, there is nothing in the Application Notes to that section which would suggest that the phrase at issue should be construed as broadly as both the PSR and the Government construe that phase.  Rather, Mr. Black submits that the phrase "obstruct the administration of justice" should be construed much more narrowly and should be limited to proceedings involving judicial activities as clearly suggested by the Application Notes which specifically refer to conduct associated with judicial activities.  Mr. Black is aware that the Application Note to

§2J1.2 includes the phrase "or the necessary expenditure of substantial governmental or court resources in the definition of "substantial interference in the administration of justice."[23]   Absent a suggestion that that subsection should be construed so broadly, Mr. Black submits that the subsection should be narrowly construed so that it does not make persons liable for conduct which is substantially attenuated from the substantially vague phrasing of "unnecessary expenditure of substantial governmental … resources."   The Sentencing Commission knows how to articulate the intent of the Guidelines as evidenced by Application Notes to each and every guideline.   They have articulated no intent that §2J1.2 should be construed as broadly as the PSR and the Government would have the Court do here.   The Court should not do so.[24]

Finally in regard to the application of the §2J1.2 enhancements, both the PSR and the Government contend that the enhancement as referenced in §2J1.2(b)(2) should also apply.   That enhancement permits a 3-level increase in the base offense level if the offense resulted in the "substantial interference with the administration of justice."   For the reasons submitted in the preceding paragraph, Mr. Black would submit that the enhancement does not apply.   In addition, it would be wholly inappropriate to apply both enhancements as to the same offense establishing the base offense level for that offense under the Guidelines. Mr. Black would submit that §2J1.2(b)(2) should be considered as a possible "lesser included enhancement" to §2J1.2(b)(1)(B) in the event that §2J1.2(b)(1)(B) did not apply due to the absence of relevant injury or property damage.   There is no indication in the Application Notes that both enhancements should be applied at the same time same and to do so would

---

[23] It is noteworthy that the word "substantial" is omitted from the phrase "administration of justice in §2J1.2(b)(1)(B).

[24] The PSR cites 3 January 6 cases where the presiding judge refused to apply the §2J1.2(b)(1)(B) and (b)(2) enhancements because obstructing the Congressional certification proceeding was not obstructing or interfering with the administration of justice.  *See,* PSR, P. 31, Probation Officer's Response to Mr. Black's objection to ¶45 of the draft PSR.  Mr. Black adopts that position as to this issue.

be the equivalent of statutorily sentencing a defendant to both the greater and the lesser included offense. There is no basis for doing so.

Mr. Black submits that the appropriate way to calculate the applicable sentencing Guidelines is to determine the base offense level for Counts 2, 3 and 4. The applicable Guideline section for Counts 2 and 3 is §2B2.3 (Trespass) which establishes a base offense level of 4. For the various reasons submitted *supra,* the cross reference found at (c)(1) of that Guideline should not apply. Nevertheless, 2 enhancements to that Guideline do apply – specifically, §2B2.3(b)(1)(A)(i) (the trespass occurred at a government facility) and §2B2.3(b)(2) (dangerous weapon). Both those enhancements permit an increase of the base offense level by 2 for a total increase of 4 resulting in a *preliminary* adjusted offense level of 8.

The applicable Guideline for Count 4 is §2K2.5 (Possession of a Firearm or Dangerous Weapon in a Federal Facility) which establishes a base offense level of 6. No enhancements further apply. Similarly, and contrary to the position of both the PSR and the Government, and for the reasons referenced above, the cross reference found at subsection (c)(1)(A) does not apply so as to implicate §2J1.2 (Obstruction of Justice). In addition, to the extent that the commission of Count 4 implicates any other Guideline by way of the intended commission of "another offense" in order to establish the relevant Guideline to be used in order to determine the base offense level, such other offense would be those offenses charged in Counts 2 and 3 which, as noted above, is §2B2.3 (Trespass).

Pursuant to §3D1.3(a), and because all of the offenses involved the same victim requiring that all Counts be grouped together, the base offense level for the group is determined by the most serious of the counts comprising the group. The most serious of the counts, *i.e.,* the highest offense level of the counts in the group, are found in Counts 2 and 3

with a *preliminary* adjusted offense level of 8 as opposed to the *preliminary* adjusted offense level of 6 applicable to Count 4.  Accordingly, §2B2.3 (Trespass) establishes the base offense level, with the enhanced upward adjustments, to be used to further the Guideline calculation.

As the penultimate proposition by Mr. Black as to the appropriate calculation of the applicable base offense and enhancements to be used in the calculation of the applicable sentencing guideline(s), he submits that the inclusion of §2A2.4 (Obstruction or Impeding Officers) as referenced by the PSR[25] and the Government[26] is misguided and inapplicable.

The PSR takes the position that §2A2.4 (Obstruction or Impeding Officers) comes into play as the result of grouping Count 3 separately from Counts 2 and 4 due to the alleged contention that the victim(s) are different from each other – Congress and law enforcement. The PSR contends that the victim as to Count 3 is law enforcement.  Both the Government and the defense contend that the victim as to Count 3 is Congress.  Section §2A2.4 is applicable in this context only if the Court concludes that the victim as to Count 3 is law enforcement rather than Congress.  The alternative Guideline section to the statutory index establishing the applicable Guideline section for a specific offense provides that the applicable Guideline section for a violation of 18 USC §1752 is either §2A2.4 (Obstruction or Impeding Officers) or §2B2.3 (Trespass).  Inasmuch as it would appear clear that the victim as to Count 3 in the instant matter is Congress rather than law enforcement, it would also appear clear that the applicable Guideline section for the purpose of establishing the base offense level is §2B2.3 (Trespass) rather than §2A2.4 (Obstruction or Impeding Officers).  In any event, because the PSR contends that there are multiple groups from which to determine the applicable base offense Guideline, §2A2.4 is superfluous from the PSR's

---

[25] *See,* PSR, P.14, ¶51.
[26] *See,* Government Sentencing Memorandum, P. 26-27.

standpoint because, as Count 3 constitutes the less serious group, application of §2A2.4 is subsumed by §2J1.2, the Guideline with the more serious (*i.e.,* higher adjusted offense level) offense level.

The Government also contends that §2A2.4 applies to Count 3 of the indictment. That contention is inconsistent with their recognition that the victim as to Count 3 is Congress – not law enforcement.  In any event, and similarly to the analysis of the PSR, the Government's submission that §2A2.4 establishes the base offense level as to Count 4 only becomes relevant when, and if, the Court rejects the Government's contention that the cross reference contained in §2B2.3 (Trespass) is inapplicable.

In the event that the Court determines that either the PSR's or Government's position that §2A2.4 should apply, Mr. Black submits that the 3-level enhancement pursuant to §2A2.4(b)(1)(A) as the result of alleged "physical contact" with police officers does not apply for the reason that any "physical contact" with any officers was entirely incidental and beyond the purview of §2A2.4

Finally, Mr. Black also submits that whatever the base offense level and associated enhancements is/are determined to be applicable in the Guideline calculation for him, he should receive a downward adjustment of 2 levels pursuant to §3E1.1(a) for acceptance of responsibility notwithstanding that this matter proceeded to trial.  Comment 2 to the Application Notes of that Guideline supports the proposition of a downward adjustment in the rare circumstance where the defendant clearly demonstrates an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  In support of that position, he submits as follows.

On January 7, 2021, following the events in DC on January 6, Mr. Black drove home to Leeds, AL.  While driving, he spoke with his wife who indicated that his presence on the

Senate floor on January 6 was the subject of videoed events from January 6 and that he was wanted for questioning by law enforcement.  Accordingly, while driving from Washington, DC to his Alabama home, he called the FBI from his cellphone (with the account in his name) without providing his name.  He indicated to the person with whom he was speaking that he understood that the FBI wanted to speak with him and that he intended to speak with them following his return to his home.[27]

The following day agents from the FBI contacted him and indicated that they would like to speak with him at a police station in Moody, AL.  Mr. Black agreed to do so and, believing that he would be arrested by the FBI, made arrangements to be driven from his home in Leeds to the police station in Moody in order to speak with agents from the FBI. The FBI agents interrogated Mr. Black for a considerable amount of time and Mr. Black answered all of their questions to the best of his ability and admitted to all of the conduct for which he was prosecuted and convicted including his possession of his hunting knife which he carried on his person while at the Capitol but which was never removed from its belted sheath underneath his coat.  To his surprise, he was not arrested following that interrogation.

On January 14, Mr. Black was contacted by the same FBI agents who had previously interrogated him.  That contact was a follow up by the agents who had, subsequent to the January 8 interrogation, consulted with prosecuting authorities who requested that the agents follow up the January 8 interrogation with additional questions for Mr. Black.  The agents requested that Mr. Black return to Moody for additional questioning.  Notwithstanding a medical appointment scheduled for later in the day, Mr. Black agreed to return to Moody for additional questioning.  He candidly answered the questions posed to him and in response

---

[27] Mr. Black did not provide his name because he was concerned that he would be stopped by law enforcement while traveling and, thereafter, arrested.  If that had occurred, he was concerned that his vehicle would be left at whatever locale in which he was arrested and that subsequent retrieval of the vehicle would be problematic for either himself or his family.

to the agents' inquiry as to the location of the clothes that he had been wearing and the knife that he possessed at the Capitol indicated that they were at his home in Leeds.  He consented to the search of his home in Leeds and to their retrieval of his January 6 clothes and the knife.  He traveled back to Leeds with the agents and advised that he had a shotgun at the home.  When he and other agents went inside his home, he pointed to the hunting knife on the coffee table in the living room and retrieved his clothes from another room.  Mr. Black and the agents left the inside of Mr. Black's home and, while in the driveway area where Mr. Black's truck was parked, Mr. Black indicated that he had a firearm in his truck.  The firearm was retrieved by the agents but not seized.  Mr. Black was, thereafter, arrested without incident.

Following his detention in the Middle District of AL, Mr. Black was removed to the U.S. District Court for the District of Columbia.  It took the U.S. Marshal's Service 4 weeks to get Mr. Black to DC.

Undersigned counsel was appointed to represent Mr. Black when he arrived in DC. He remained detained until April 24, 2021 when this Court vacated the Order of detention and released Mr. Black on his personal recognize with GPS monitoring and restrictions on his travel.[28]  Pretrial supervision was carried out by U.S. Probation for the Middle District of Alabama.  Mr. Black has been compliant with all conditions of supervision while on pretrial release.

Shortly into the initial phase of discovery in the spring of 2021 undersigned counsel, with the acquiescence of Mr. Black who wanted to accept responsibility for his participation in the events of January 6, indicated to the Government that counsel anticipated that the parties would be able to reach a plea agreement in order to avert the necessity of a trial.  A

---

[28] Mr. Black was detained for 99 days before his release.

plea offer was extended by the Government on May 26, 2021.  That plea offer, however, was substantially problematic.  It required Mr. Black to plead guilty to the lead count of the indictment, Obstruction of an Official Proceeding in violation of 18 USC, § 1512(c)(2), and required Mr. Black to stipulate to the both 8 level and 3 level enhancements pursuant to USSG §§ 2J1.2(b)(1)((B) and (b)(2) respectively.  It also required Mr. Black to pay $2000 in restitution.   Although Mr. Black and counsel had no opposition to the restitution component of the plea offer, Mr. Black did not believe that he was guilty of the lead count of the indictment because his intent was to "plead the blood of Jesus" on the Capitol. Undersigned counsel was particularly concerned about stipulating to the enhancements required of the plea inasmuch as such enhancements appeared to be inapplicable to Mr. Black.   Undersigned counsel suggested that Mr. Black be permitted to plead to a misdemeanor offense and that Mr. Black be permitted to argue the applicability of the enhancements.[29]

        Sometime during the summer of 2021, the Government indicated that they were willing to permit Mr. Black to argue the applicability of the 8-level enhancement but that Mr. Black would still have to plead to Obstruction of an Official Proceeding and stipulate to the 3-level enhancement.  In addition to other concerns related to the applicability of those enhancements to Mr. Black, because both of the enhancements dealt with the administration of justice which counsel believed to be inapplicable to the certification of the electoral college results pending before Congress on January 6, it would have been inconsistent to argue the applicability of the one enhancement while stipulating to the other.  In addition, Mr. Black still believed himself to be not guilty of Obstruction of an Official Proceeding.

---

[29] At the time, undersigned counsel assumed, erroneously, that the enhancements could still be argued by the Government notwithstanding a plea to an offense other than Obstruction of an Official Proceeding.

During various status hearings for the next several months the Court inquired as to the prospect of Mr. Black entering into a plea agreement in order to avoid the necessity of a trial. The parties advised that they were working on entering into such an arrangement and that Mr. Black wished to do so but that they were having difficulty in that regard. At one point during that period the Court inquired as to whether the impediment to entering into such an arrangement was the requirement that Mr. Black plead guilty to a felony. The Government responded that that was the impediment. The Court urged the parties to continue to try to come to an agreement and suggested that the Government try to be more flexible in that regard. The parties were unsuccessful in those continued attempts and, in August 2022, the matter was set in for a January 9, 2023 trial.

A Joint Pretrial Statement was filed by the parties in early December 2022 prior to a pretrial conference later that month. Mr. Black entered into several evidentiary stipulations which were referenced in the Joint Pretrial Statement and which were intended to shorten and streamline the pending trial. At the time of the December 20, 2022 pretrial conference, Mr. Black waived a trial by jury thereby further shortening the length of the pending trial.

Following the December 20 Pretrial Conference, the 3 assigned AUSAs approached counsel in order to confer about a possible disposition short of trial. They inquired as to whether Mr. Black might then be willing to plead guilty of Obstruction of an Official Proceeding to which undersigned counsel replied in the negative. They then indicated that, although they had yet to clear their proposal with supervisory authorities, they proposed that Mr. Black could pick any other felony to which he would plead guilty. Undersigned counsel conveyed the proposal to Mr. Black in the Courthouse cafeteria that day. Mr. Black agreed to enter into such an agreement. The following morning undersigned counsel contacted the Government and advised that Mr. Black was willing to enter into such an

agreement.  Before undersigned counsel could advise as to which felony Mr. Black had agreed to plead guilty to the assigned AUSAs advised that personnel higher in the prosecutorial chain of command had told them that such an arrangement could not move forward.[30]

Trial by the Court commenced on January 9, 2023.  As part of his Rule 29 motion for a judgment of acquittal, Mr. Black conceded guilt as to Count 5 of the indictment.  He also conceded as to several of the elements of the other offenses in the various other counts of the indictment.  The only true issues which he disputed were guilt as to Obstruction of an Official Proceeding and whether the hunting knife in his possession was a dangerous or deadly weapon – either *per se* or in fact.  Mr. Black did not testify or present a defense.  On January 13 the Court made various findings.  The Court found that the Government had not proven Mr. Black guilty beyond a reasonable doubt of Obstruction of an Official Proceeding, the offense for which Mr. Black was unwilling to admit guilt.  The Court found him guilty of all other counts including the "while armed" elements of Counts 2 and 3 which were disputed by Mr. Black.

Mr. Black respectfully submits that the foregoing account of the pretrial proceedings during which the parties attempted to resolve the accountability issues short of trial justifies a 2-level downward adjustment from the otherwise applicable Sentencing Guideline

---

[30] The Government indicates in their Sentencing Memorandum that following the pretrial conference, and for the first time, undersigned counsel indicated a "nebulous" interest in entertaining a felony plea after that hearing.  *See,* Government Sentencing Memorandum, P.30.  The implication conveyed by the Government is that undersigned counsel approached the Government with such a "nebulous" proposition.  Undersigned counsel's recollection as to how that conversation transpired was that Government counsel approached undersigned counsel in order to explore whether Mr. Black would enter into a plea to any other felony if Mr. Black remained unwilling to plead guilty to Obstruction of an Official Proceeding.  As previously noted, that overture by the Government was conveyed to Mr. Black that day and undersigned counsel responded the following day so as to accept the plea offer to plead to a specific felony only to be told that that "offer" by the Government the preceding day had been rescinded by supervisory authority.

calculation and should be applied no matter what the Court determines to be the applicable base offense level with applicable enhancements.

Pursuant to the foregoing analysis, Mr. Black submits that the appropriate Guideline calculation requires application of §2B2.3 (Trespass) without reference to the cross reference to that section.   Rejecting the applicability of the cross reference negates implication of §2J1.2.   Accordingly, the base offense level is established as 4.   Thereafter, the 2 level enhancements found at §2B2.3(b)(1)(A)(i) (trespass occurred at a government facility) and §2B2.3(b)(2) (dangerous weapon) should be applied so as to increase the base offense level to 8.   Last, a 2-offense level downward adjustment should be applied for acceptance of responsibility pursuant to §3E1.1(a) which results in a final adjusted offense level of 6.   A Guideline compliant sentence for adjusted offense level 6 in Criminal History Category I is 0 to 6 months.

### III.   Non-Guideline Sentencing Factors To be Considered

As the Court is aware, the sentencing of federal criminal defendants is governed by 18 U.S.C. § 3553 as interpreted by *United States v. Booker*, 125 S. Ct. 738 (2005) and its progeny.   In that regard, *Booker* restored the district courts' ability to fashion a sentence tailored to the individual circumstances of the case and defendant by requiring sentencing courts to consider *all* of the various factors referenced in § 3553 in addition to consideration of the now discretionary application of an appropriately calculated guideline sentencing range.   Accordingly, the guidelines are now only one of several factors,[31] pursuant to the

---

[31] In fact, although the District Court must give respectful consideration to the guidelines in determining a sufficient sentence, *Gall v. United States,* 128 S.Ct. 586, 594 (2007) it may not presume that the guideline sentence is the correct one, *Rita v. United States,* 127 S.Ct. 2456, 2465 (2007), or even give greater weight to the guidelines than other sentencing considerations.   *United States v. Sachsenmaier,* 491 F.3d 680, 685 (7th Cir. 2007).   In fact, it is respectfully submitted that a sentencing court should consider all relevant sentencing factors and not give undue weight to the Sentencing Guidelines.   In that regard, judicial tradition in sentencing strongly suggests that every sentencing judge "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."   *Gall* at 598 (quoting *Koons v. United States,* 518 81, 113 (1996).

dictates of § 3553, which the Court must consider when imposing a sentence which is, as per the dictate of §3553, "sufficient, but not greater than necessary" to comply with the purposes set forth in that statute.[32]

Also, and as the Court is aware, the factors which the court is required to consider pursuant to the dictates of § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparity; and (7) the need to provide restitution; and, (5) the sentencing range calculated pursuant to the Federal Sentencing Guidelines.  18 U.S.C. § 3553.   Perhaps even more important, however, is that *Booker* and its progeny have established an independent limit on the sentence that may be imposed. That is for the reason that the primary sentencing mandate of § 3553(a) states that courts must impose the minimally-sufficient sentence to achieve the statutory purposes of punishment, justice, deterrence, incapacitation, and rehabilitation:

> The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)].

18 U.S.C. § 3553(a) (emphasis added). This so-called "parsimony provision" is not simply a factor to be considered in determining sentence; it represents a cap above which the Court

---

[32] Mr. Black would submit that all of the other sentencing factors referenced in §3553 are subservient to §3553(a)'s overarching mandate that a sentence be sufficient, *but not greater than necessary,* to comply with the statutory purposes of sentencing.

is *statutorily prohibited* from sentencing—even if a greater sentence is recommended by the sentencing guidelines. *Kimbrough v. United States,* 128 S.Ct. 558, 570 (2007).

As submitted previously, Mr. Black is requesting that the Court reject the Guideline calculation advanced by both the PSR and the Government and to adopt the admittedly widely disparate calculation advance by Mr. Black.  In the event, however, that the Court determines that Mr. Black's position as to the applicable calculation, in whole or in part, is without merit and, accordingly, adopts a calculation harsher than that advanced by Mr. Black, he respectfully requests that the Court vary downward from the otherwise determined Guideline compliant sentence and fashion a variant sentence which includes credit for the 99 days he was detained following his January 14, 2021 arrest which does not require a further period of imprisonment.

Mr. Black is aware that the Government is requesting that Mr. Black to be required to serve a 60 month period of imprisonment pursuant to the their U.S. Sentencing Guideline calculation which Mr. Black substantially disputes achieves the overarching mandate of 18 USC  §3553.   Moreover, Mr. Black respectfully submits that the sentence that the Government is requesting is substantially at odds with the "*sufficient, but not greater than necessary*" mandate of § 3553(a).

Mr. Black appreciates that one of the factors that a sentencing court should take into consideration when imposing sentence is to provide "just punishment" for the offense.  18 USC § 3553(a)(2)(A).  And, certainly a sentence as advocated by the Government constitutes punishment.  However, counsel for Mr. Black would submit that it would not constitute "just punishment."

Such a sentence as advocated by the Government would ignore other factors which militate against such a sentence.  It ignores the fact that Mr. Black did not assault or threaten

anyone during the events of January 6 as did other and, in fact, took steps to both urge others to "lay off" law enforcement officers just doing their job and, further, took steps to protect a downed officer.  It ignores the fact that Mr. Black did not destroy any property, as did other protestors, during the events of January 6.

On January 7, 2021, Mr. Black realized that he was going to be held to account for his conduct on January 6.  Knowing that he was the subject of law enforcement inquiry on January 7, he contacted the FBI, albeit anonymously, to acknowledge his recognition that law enforcement wanted to speak with him.  At the FBI's telephonic request, the following day, January 8, he went to a local police station to discuss with FBI agents his participation in the events of January 6.  He candidly spoke of what he had done at the Capitol including having been in possession of a knife while on the Capitol grounds and in the building.  He did the same when called by the FBI again on January 14 and consented to a search of his home in order to permit the FBI to retrieve evidentiary items which Mr. Black knew further incriminated him in the events of January 6 beyond the candid and knowingly incriminating statements he had already made.  That recognition and immediate cooperation with law enforcement in the aftermath of January 6 stands in stark contrast to the hundreds of protestors who have attempted to evade accountability as well as the hundreds who are still evading accountability by refusing to come forth voluntarily.

Despite the suggestion of the Government that he has refused, and continues to refuse, to take responsibility for his conduct on January 6, Mr. Black submits that he has always been willing to accept responsibility for his conduct.  His cooperation with law enforcement beginning on January 8 evidences that willingness.  The overtures by undersigned counsel to enter into an early disposition of the Government's prosecution of him evidences that willingness and acceptance of responsibility.  The trial stipulations and

concessions that he entered into also exhibit that willingness and to be accountable.  The Government's suggestion that his resistance to entering into the disposition of the prosecution which the Government thought appropriate and for which he was, ultimately, acquitted is misguided.  Resistance to their demand to accept their proposed disposition does not equate to refusal to account for his conduct.

By virtue of compliance with the conditions of his release, including traveling hundreds of miles to appear in Court for pretrial and trial proceedings,[33] Mr. Black has already shown his willingness to comply with whatever the Court requires of him in the future.  The Court can fashion a variant sentence which avoids unnecessary imprisonment in the Bureau of Prisons such as continued home detention through GPS monitoring, as well as some form of community service, which the Court can confidently anticipate compliance by Mr. Black.

Mr. Black certainly recognizes that there is a deterrent component to sentencing which is a factor that he does not minimize.  It is respectfully submitted, however, that the sentencing goal of specifically deterring Mr. Black from future criminality should carry little weight.  Mr. Black has not led a life of crime and he has not been involved in criminal conduct since the conduct of 2 ½ years ago which is now the subject of his sentencing.  For the same reason, protecting the public from future criminality of Mr. Black is unnecessary.  Given the absence of criminality since the time of the commission of the offenses for which he is now being sentenced, there is no reason to believe that the public needs to be protected from Mr. Black in the future. And, although the goal of generally deterring others from criminal activity is a relevant consideration, Mr. Black would submit that a sentence which

---

[33] During the 8 days and 7 nights that Mr. Black was in the DC metropolitan area while attending the trial which commenced on January 9, 2023, Mr. Black traveled back and forth from counsel's office in Montgomery County and the U.S. District Court for the District of Columbia while spending the nights sleeping in his car at a truck stop in Jessup, MD.

has the kind of financial component anticipated in the instant matter, as well as the restrictions on his liberty which this Court is able to impose short of imprisonment, is sufficient, but not greater than necessary, to promote that general deterrence goal of sentencing.

Mr. Black also recognizes that punishment is a valid sentencing consideration. He further recognizes that the Government's sentencing position has merit with respect to generally deterring others from similar conduct. Nevertheless, the Government's sentencing position seems to be primarily focused on the punitive component of sentencing. But, if punishment is to be "just", the sentence imposed should take into account that part of a defendant's life which evidences a defendant's capability of redemption. The Government's current position with respect to how Mr. Black should be sentenced does not and, more importantly, violates the §3553 mandate. Moreover, the Government's legitimate concern for deterrence rises to the level becoming unduly significant goal factor in the sentencing of Mr. Black. It should not be forgotten that the efforts that Mr. Black has undertaken in an attempted to resolve this matter short of an unnecessarily lengthy and contentious jury trial is likely to deter similarly situated January 6 defendants from undertaking the same attempts to accept responsibility and resolve their matters short of trial.

Avoidance of unwarranted sentencing disparities between similarly situated January 6 defendants pursuant to 18 USC § 3553(a)(6) is also a relevant sentencing factor. It is, however, extremely difficult to identify those who are similarly situated to Mr. Black. That would require identifying 40 something defendant(s) with no criminal record, a somewhat impoverished background with limited education who profess to be motivated primarily by their faith, who didn't participate in assaultive or destructive conduct on January 6, who sought to protect law enforcement from other protestors, who cooperated with law

enforcement to the extent that Mr. Black did but who were, nevertheless, charged with Obstruction of an Official Proceeding and acquitted of that offense at trial and many of the January 6 protestors were charged with trespass and disorderly types offenses.  Many of those cases have been resolved without the imposition of the kind of sentence of imprisonment that the Government is requesting be imposed upon Mr. Black.

The foregoing is not to suggest that Mr. Black's participation in the events of January 6 including, most importantly, the offenses for which he is now being sentenced is not serious and should not be taken into account when determining an appropriate sentence.  But, Mr. Black would submit that the other factors referenced herein outweigh that factor and, in fact, weigh against further imprisonment as requested by the Government when just alternatives and variances are available.  Probationary or supervised release supervision, along with a period of home confinement, monitoring, community service, and the imposition of the requested restitution are *sufficient, but not greater than necessary*, to advance the goals of a just sentence.

## IV.  Conclusion

Accordingly, and for the reasons discussed above, Mr. Black would respectfully request that he be sentenced in a manner which requires no further imprisonment and is consistent with the kinds of sentences imposed upon other January 6 defendants with similar histories and other offense conduct.

Respectfully submitted,

_____/S/_____
Clark U. Fleckinger II
Attorney for Defendant
9805 Ashburton Lane
Bethesda, MD 20817
(301)294-7301
cufleckinger@aol.com
Bar No. 362393

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that a true copy of the foregoing Defendant's Memorandum in Aid of Sentencing, has been served, by ECF, upon AUSA Seth Adam Meinero and all other counsel of record, at the United States Attorney's Office, this 8th day of May, 2023.

                      _____/S/_____
                      Clark U. Fleckinger II